## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>                    v.<br><br>ROBERT HILLIS MILLER,<br><br>                              Defendant. | Civil Action No. _____<br>                Jury Trial Demanded |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges the following against Defendant Robert Hillis Miller ("Miller" or "Defendant").

### SUMMARY

1.      Miller founded and served at all relevant times as the CEO, Chairman, and largest reported beneficial owner of Abakan, Inc. (ticker:ABKI), a Miami, Florida-based penny stock issuer.  From at least August 2013 through October 2015 (the "Relevant Period") (the full timeliness of which preserved by the tolling agreements described at ¶¶ 105-06 below), Miller represented in his public SEC filings, as well as those of Abakan, that he beneficially owned 24 million shares of the company, representing up to a 38% interest.  Miller's statements, however, were materially misleading because they failed to disclose (i) that he beneficially owned an additional 7 million shares, or an 11% interest, that he had placed in the names of certain offshore entities over which he exercised secret control (hereinafter "the Uruguayan Fronts"); and (ii) that he was engaging in unregistered public offerings of such shares to fund Abakan.

2.      During the Relevant Period, Miller orchestrated fraudulent unregistered public offerings of Abakan shares held by the Uruguayan Fronts, resulting in the liquidation of approximately 1.7 million shares without any of the public disclosures or registrations required by law.  Miller accomplished these offerings by means of material misstatements and omissions and additional deceptive conduct to conceal his beneficial ownership.  Miller used the resulting stock sale proceeds, totaling approximately $1.39 million, to fund the company, which had generated no significant revenue since its inception in 2009.  This funding of the company included paying its vendors and employees, including Miller himself.

3.      Congress enacted the Securities Act of 1933 to regulate the offer and sale of securities.  In contrast to ordinary commerce, which often operates under the principle of *caveat emptor*, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide adequate and accurate information to allow investors to make informed investment decisions.  Such disclosure is ordinarily provided in a "registration statement," filed through the Commission's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, the publicly accessible website through which almost all SEC filings are required to be filed.  A registration statement provides public investors with financial and managerial information about the issuer of the securities, such as details about the terms of the securities offering, the proposed use of investor proceeds, and an analysis of the risks and material trends that would affect the enterprise.

4.      Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce.  Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell

or offers to buy, unless a registration statement has been filed or an exemption from registration applies.  Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce absent an exemption.

5.     The Securities Exchange Act of 1934 (the "Exchange Act") governs trading in the secondary market for securities and broadly empowers the Commission to regulate the securities industry, including mandating periodic reporting of material information by companies with publicly traded securities, their officers, directors and significant shareholders.  Section 13(a) of the Exchange Act and the rules thereunder [15 U.S.C. § 78m(a); 17 CFR § 240.13a-1] require an issuer with registered securities to file an annual report called a Form 10-K.  A Form 10-K, signed and certified by the CEO and filed on EDGAR, provides investors with key information about the issuer's business, finances, management, and other matters, including beneficial ownership tables to reflect the amounts of securities "beneficially owned" by management and certain large shareholders.  Form 10-K additionally requires disclosure of material related party transactions, generally any transaction or series of transactions exceeding $120,000 where the registrant participates and any "related person" holds a direct or indirect material interest.  In addition the disclosures explicitly required by Form 10-K, Exchange Act Rule 12b-20 [17 CFR § 240.12b-20] requires disclosure of any other material information necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

6.     The federal securities laws define beneficial ownership more broadly than the general concept of legal title or ownership.  Exchange Act Rule 13d-3 [17 CFR § 240.13d-3], for example, defines a "beneficial owner" as any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares (1) voting power and/or (2) investment power, which includes the power to dispose, or to direct the disposition of,

such security.  In the context of reporting by corporate insiders, Exchange Act Rule 16a-1(2) [17 CFR § 240.16a-1(2)] defines beneficial ownership to mean any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities.

7.      In terms of beneficial ownership reporting, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] requires any person acquiring beneficial ownership of more than 5% of certain registered securities to disclose information about their holdings publicly by filing a Schedule 13D on EDGAR, and to file prompt amendment upon any material change.  The Exchange Act also requires officers, directors, and any person acquiring beneficial ownership of more than 10% of certain registered equity securities to file a statement of beneficial ownership in a Form 3.  [15 U.S. Code § 78p; 17 CFR § 240.16a-2, 16-a3].  Thereafter, such person has an ongoing duty to report each change in beneficial ownership, regardless of quantity, and whether by sale, transfer, or other disposition, within two business days by filing a Form 4.  Officers, directors, and 10% stockholders are also required to file an annual statement of beneficial ownership on Form 5.

8.      Collectively, these and other provisions of the federal securities laws protect investors by ensuring they are made aware of important information necessary to make informed investment decisions.  Investors reasonably view these disclosures, such as transactions in a public company's stock by that company's officers, directors, and major shareholders, as an important gauge of those insiders' sentiments concerning the company's financial condition and prospects.  When these important, required disclosures are evaded or issued in a misleading fashion, investors are deprived of material information about a public company.

9.      Miller failed to comply with the registration requirements when he orchestrated

unregistered public offerings of Abakan shares held in the names of the Uruguayan Fronts. Miller also failed to disclose accurately or adequately in required public filings his true beneficial ownership of, and transactions in, Abakan stock.

10.     Miller made affirmative misstatements and omissions to conceal his beneficial ownership of and trading in Abakan stock, including:

- misrepresenting to brokerage firms and a lender that the Uruguayan Fronts were not affiliated with Abakan.

- signing and certifying the accuracy of false and misleading Forms 10-K on behalf of Abakan that included material misrepresentations and omissions of Miller's true beneficial ownership, the transactions between Abakan and the Uruguayan Fronts, the existence and extent of Miller's Form 4 filing delinquencies, and the funding of Abakan's operations through illegal unregistered public offerings;

- failing to file Forms 4 which must be filed by corporate officers and directors within two days of any change in beneficial ownership.; and

- signing false and misleading beneficial ownership forms.

11.     Miller's fraudulent course of conduct deceived shareholders, purchasers, and the market.  Every Abakan Form 10-K and beneficial ownership form Miller signed and filed during the Relevant Period represented that Miller's sole holdings of Abakan shares consisted of 24 million Abakan shares, representing between a 35-38% interest in the company over time:

| Miller Disclosed Shareholdings as of August 2013 | | |
|---|---|---|
| Shareholder | Total | % Issued Shares |
| Miller's Wife | 17,420,000 | 27.10% |
| Trust for Miller's Children | 5,250,000 | 8.17% |
| Canadian Charity Run by Miller | 1,450,000 | 2.26% |
| Total: | 24,120,000 | 37.52% |

12.      This disclosed number stayed constant throughout the Relevant Period, thereby conveying to investors that during the entire Relevant Period, Miller (i) controlled only those 24 million Abakan shares, and (ii) never sold a single share of Abakan stock.

13.      In reality, Miller beneficially owned more than 7 million additional Abakan shares (11% of the company) held in the names of the Uruguayan Fronts, as follows:

| Miller Undisclosed Shareholdings as of August 2013 | | | |
|---|---|---|---|
| Shareholder | Total | % Issued Shares | % Public Float |
| Stratton S.A. | 2,667,411 | 4.15% | 6.42% |
| Green Chip S.A. | 2,585,895 | 4.02% | 6.22% |
| River Fish Holdings, Ltd. | 1,899,847 | 2.96% | 4.57% |
| Total: | 7,153,153 | 11.13% | 17.21% |

14.      Not only did Miller beneficially own these shares, he was in fact orchestrating illegal public offerings of such shares to raise capital urgently required to keep the company afloat and pay its vendors and employees – including himself.

15.      Miller's fraudulent course of conduct also deceived several financial institutions, such as brokerage firms and a corporate lender, when Miller made, drafted, or disseminated false statements representing that the Uruguayan Fronts were unaffiliated with Abakan or any of Abakan's affiliates, including Miller.  But for these misrepresentations, the relevant financial institutions would not have accepted the Abakan shares obtained from the Uruguayan Fronts for deposit and sale or as collateral for loans.

16.      It was important to the relevant financial institutions that they not allow restricted

shares to be deposited or sold absent a valid exemption because they might be deemed underwriters in such public offers and sales and inadvertently violate Section 5 of the Securities Act.  Therefore, absent these misrepresentations, Miller would not have been able to monetize the shares held in the Uruguayan Fronts through their subsequent public liquidation into the U.S. market.

17.     During the Relevant Period, Miller's secret unregistered offerings of Abakan stock yielded at least $1.39 million in illicit proceeds.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

18.     By engaging in the conduct described herein, Miller violated the registration and antifraud provisions of the Securities Act [15 U.S.C. §§ 77e(a), (c)  and 77q(a)]; the antifraud, beneficial ownership reporting, and CEO certification provisions of the Exchange Act, and rules thereunder [15 U.S.C. §§ 78j(b), 78m(d) and 78p, and 17 C.F.R. §§ 240.10b-5, 13a-14, 13d-1, 13d-2, 16a-2 and 16a-3]; and aided and abetted Abakan's violations of the annual reporting provisions of the Exchange Act and rules thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.13a-1 and 12b-20].  Miller will continue to violate the aforementioned provisions unless restrained or enjoined by this Court.  Accordingly, the Commission seeks injunctive relief, disgorgement of ill-gotten gains, prejudgment interest, civil penalties, and other appropriate and necessary equitable and ancillary relief.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to Securities Act Sections 20(d)(1) and 22(a) [15 U.S.C. §§ 77t(d)(1) and 77v(a)], and Exchange Act Sections 21(d) and 27(a) [15 U.S.C. §§ 78u(d) and 78aa(a)].

20.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred within the District of Maryland.  Specifically, throughout the Relevant Period, the Commission's EDGAR computer server was located in Beltsville, Maryland, within this District.  This is the location (i) where Miller filed each of the false and misleading Forms 10-K and beneficial ownership reports encompassed by this complaint, and (ii) from whence that false information was disseminated to the public.

21.     In connection with the conduct described in this Complaint, the Defendant directly or indirectly made use of the means and instrumentalities of interstate commerce, of the mails or of the facilities of a national securities exchange, in connection with the acts, practices and courses of business alleged herein, certain of which occurred within the District of Maryland.

**DEFENDANT**

22.     Robert Hillis Miller, age 65 and a resident of Coral Gables, Florida, founded and controlled Abakan at all relevant times through his role as its CEO, Chairman, and largest reported shareholder.  Miller began his career working in the securities industry in Vancouver, Canada, first as a Registered Representative from 1982-83 and then as an investment adviser from 1983-88.  Miller and his then-wife (the "Former Spouse," defined below), moved to her home country of Uruguay in 1993 and later settled in Miami, Florida.  Miller has been a founder, officer, director, or major shareholder of over 50 development stage companies, many of which were public reporting penny stock issuers with shares quoted in the U.S. and Canadian over-the-counter markets.

**OTHER RELEVANT PERSONS AND ENTITIES**

23.     Abakan, Inc. ("Abakan") is a Nevada corporation established in November 2009 with its former principal place of business in Miami, Florida.  Abakan's common stock, including all predecessors, was registered under Section 12(g) of the Exchange Act from August 29, 2007 until May 17, 2018, when the Commission revoked Abakan's registration pursuant to Section 12(j) of the Exchange Act due to the company's delinquency in filing required reports.  Abakan's common stock was a penny stock quoted over-the-counter under the symbol "ABKI" until its revocation.

24.     MesoCoat, Inc. ("MesoCoat") was an Ohio-based nano-technology company attempting to commercialize patented metal coating technology it had developed.  During the Relevant Period, MesoCoat was between 53% and 100% owned by Abakan, and was Abakan's sole material operating subsidiary.

25.     The Uruguayan Accountant, age 70, is a Uruguayan citizen residing in Montevideo, Uruguay and a long-time friend and business associate of Miller.  At all relevant times, the Uruguayan Accountant was the Director of a corporate administrative services firm in Montevideo, Uruguay, where she was a *Contadora Publico,* which is analogous to a U.S. Certified Public Accountant.  At all relevant times, the Uruguayan Accountant had or shared signatory authority over all the Uruguayan Fronts and their financial accounts.

26.     The Former Spouse, age 67, was Miller's wife from approximately the early 1980's until their divorce in 2001.  Like Miller, she was a registered investment adviser in Vancouver, British Columbia from 1983-87.

27.     Stratton S.A. ("Stratton") is a Uruguayan entity whose address during the Relevant Period was that of the Uruguayan Accountant's firm, in Montevideo.  Stratton's only

material assets during the Relevant Period appear to be shares or other interests in Miller-linked issuers and companies.  At various times, Stratton maintained bank and brokerage accounts in the United States, Uruguay, and Canada.

28.     Green Chip S.A. ("Green Chip") is a Uruguayan entity whose address during the Relevant Period was that of the Uruguayan Accountant's firm, in Montevideo.  Green Chip's only material assets during the Relevant Period appear to be shares or other interests in Miller-linked issuers and companies.

29.     River Fish Holdings, Ltd. ("River Fish") is a British Virgin Islands entity with its principal place of business in Montevideo, Uruguay.  River Fish was formed in connection with Miller's divorce from the Former Spouse in 2001 and funded substantially by proceeds of sales of stock in a successful previous Miller venture.  At various times, River Fish maintained bank and brokerage accounts in the U.S., Liechtenstein, and Switzerland.

30.     Steven R. Ferris ("Ferris"), age 67, is a U.S. citizen residing in Bellevue, Washington.  Ferris was an investor relations consultant to Abakan from at least May 2011 through at least January 2015.  Ferris is a former registered representative, having held Series 7 and 63 licenses between 1986 and 1996.  In August 2017, the Commission filed a settled action in the District Court for the Southern District of Florida, alleging that Ferris and others engaged in a manipulative scheme to fraudulently inflate Abakan's share price in an effort to assist the company in obtaining a NASDAQ listing. SEC v. Cedrone et. al., 9:17-cv-80999-RLR (S.D. Fla 2017).  The Commission's action against Ferris also charged him for his participation in illegal unregistered public offerings of Abakan securities, including some of the offerings alleged in this complaint.

## FACTS

### I.   MILLER FOUNDS ABAKAN AND EXERCISES CONTROL OVER SHARES

31.   Miller founded Abakan in November 2009 to hold an interest in MesoCoat, Inc. Miller negotiated an investment agreement with MesoCoat and raised financing to fund the initial stage of investment.

32.   At the time, Miller held a significant interest in a shell company whose stock was quoted publicly in the U.S. but whose business plan Miller had abandoned.  In the transactions by which Miller acquired control of this shell company in 2008, he directed that certain shares be issued in the registered names of, among other individuals and entities, three Uruguay-based entities that shared a common administrator: Stratton S.A. ("Stratton"); Green Chip S.A. ("Green Chip"); and River Fish Holdings, Ltd. ("River Fish") (collectively "the Uruguayan Fronts").

33.   One or more of the Uruguayan Fronts were investors in nearly every Miller venture, and Stratton and Green Chip do not appear to have invested in anything other than Miller businesses.

34.   Abakan's corporate predecessor filed a Form 8-A with the Commission on August 29, 2007, registering its common stock pursuant to Section 12(g) of the Exchange Act. From that time until the Commission revoked Abakan's registration in 2018, the issuer, its officers, directors, and major shareholders were required to make public filings on Forms 10K; Schedules 13D; and Forms 3, 4, and 5.

35.   At its peak in 2013, Abakan reported assets of $16.6 million, liabilities of $7 million, and a net loss of $7.2 million, primarily attributable to Abakan's interest in MesoCoat.

36.   The purported ownership of the Uruguayan Fronts varied among a small number of Miller associates, including Miller's ex-wife (the Former Spouse), Miller's ex-mother-in-law (the Former Spouse's elderly mother), and the Uruguayan Accountant's fourth husband.

37.     The Uruguayan Accountant, the Former Spouse, and Miller's best friend and business partner (the "Late Best Friend") who died in March 2009), were university classmates in Uruguay in the early 1970's.  After graduation, all three worked together as *Contadores Publicos*, the Uruguayan equivalent of Certified Public Accountants, at the Montevideo-based accounting office of the Uruguayan Accountant's father.

38.     At all times, Stratton and Green Chip shared the same physical address as the Uruguayan Accountant's office in Montevideo.  River Fish's purported principal place of business was in a Montevideo industrial park.

39.     The Uruguayan Accountant was an officer or director of each Uruguayan Front with sole or shared signatory authority over all known financial accounts, which were maintained over time in the United States, Uruguay, Liechtenstein, Switzerland, and Canada.  The Uruguayan Accountant's signature appears on every relevant document on behalf of Green Chip, Stratton, and River Fish concerning Abakan stock or shares in other Miller ventures.

40.     Although the Uruguayan Accountant signed relevant documents related to the Uruguayan Fronts' securities transactions and movements of money and securities, she administered the Uruguayan Fronts' holdings of shares in Miller's companies at Miller's direction and did not exercise independent control over the holdings.

41.     Miller secretly exercised control over the Abakan shares held in the Uruguayan Fronts during the Relevant Period.

42.     Miller regularly contacted the Uruguayan Accountant, or her office, or instructed his nominees, including his adult son, to do so, over more than a decade concerning the Uruguayan Fronts' holdings of shares or debt in Miller's companies, including Abakan.

43.     Miller funded the Uruguayan Fronts.  For example, when River Fish opened a

12

bank account in Liechtenstein in 2004, the source of funds documentation submitted by the

Uruguayan Accountant and the Late Best Friend, acting on behalf of River Fish, consisted of

Canadian brokerage record of two Uruguayan entities (one of which was Stratton) detailing more

than CAD$10 million in proceeds from public sales of stock in a successful Miller venture in

1999.  The account's opening documentation detailed that the source of the funds was Miller

who had provided those assets purportedly in connection with his divorce from the Former

Spouse.

44.     As to Green Chip and Stratton, both entities' sole holdings since at least 2009

were interests in Miller's own companies.  River Fish, for its part, maintained a separate sub-

account at the Liechtenstein bank that only transacted in securities of Miller-related entities.

However, River Fish maintained a separate account that also held a diversified portfolio.

45.     During the Relevant Period, transactions in Abakan securities held by the

Uruguayan Fronts were initiated and negotiated by Miller, performed in furtherance of a Miller

objective, and the resulting proceeds were applied pursuant at Miller's instructions.

46.     Miller has previously characterized the Uruguayan Fronts' funds and shares as his

own.  On a resumé, for example, Miller stated that he financed Company A, a private company,

"for $7 million personally."  A document prepared by Company A titled, "R. Miller Stock

Holdings" reflects none of that stated investment amount came from Miller himself, but rather

from the Uruguayan Fronts, in addition to a Canadian holding company Miller controlled.

Similarly, in confidential financial spreadsheets Miller authored, he grouped shareholdings by

the Uruguayan Fronts under headings indicating he viewed them as his own (e.g., "RHM Total $

Amounts"), "RHM" being Miller's initials.

47.     Similarly, by mid-2012, when another Miller-linked company ("Company B")

needed funding immediately lest it be forced to cease operations, Miller emailed Company B's CEO, saying, "My only way to fund [Company B] now is to sell shares of Abakan, so I have to fund/protect Abakan, so that I can fund [Company B]."  However, Miller at no point disclosed owning any unrestricted shares of Abakan that could be sold quickly in the market to provide the funding required by Company B.

48.     Miller supervised the Uruguayan Fronts' holdings of shares and interests in the companies he owned and ran, and controlled those holdings using third persons.

49.     Miller also delivered instructions through his son as a conduit for Abakan transactions in Stratton's account.  For example, on June 8, 2011, the Uruguayan Accountant's office emailed Miller's son while he was employed at Abakan with the subject line "Abakan shares."  An employee of the Uruguayan Accountant relayed in Spanish that she had just spoken to Stratton's Uruguayan broker and "according to your instructions [tus instrucciones] I asked him to sell 1500 shares at 1.45.  He asked me if it's just for today or if he should maintain it tomorrow."

50.     Miller directed the disposition of proceeds of transactions entered into by the Uruguayan Fronts.  For example, between August 28 and December 23, 2013, River Fish sold 182,989 shares of Abakan stock, generating proceeds in excess of $200,000.  During that same period, River Fish wired $125,900 to Abakan, $25,000 to Company B (the company Miller wrote that he would fund through sales of Abakan stock)), and at least $6,200 to pay Abakan-related invoices, including the origination fee for one of the Green Chip loans described below.

51.     Miller failed to produce to the Commission any documentary evidence that the Uruguayan Fronts ever refused to implement any Miller request for any transaction in Abakan securities or for the disposition of the proceeds thereof.

52.     Throughout Abakan's existence, as demonstrated by each of these facts, Miller exercised control over the Uruguayan Fronts and their holdings of shares and interests in the companies he invested in or ran.

## II.     MILLER USED GREEN CHIP, STRATTON, AND FERRIS TO MAKE UNREGISTERED SECURITIES OFFERINGS OF ABAKAN SECURITIES

53.     Throughout Abakan's existence, the Uruguayan Fronts obtained Abakan shares and sold them into the markets in unregistered public offerings.  These offerings were made by means of materially false and misleading statements made, drafted, or disseminated by Miller fraudulently disavowing that the Uruguayan Fronts were affiliates of Abakan, of Miller, or both.

54.     The proceeds of these securities transactions were used primarily to keep Abakan and MesoCoat in operation, including by paying Miller's Abakan salary and expenses, paying Abakan's office rent (to a Miller-affiliated company), paying Abakan's vendors, and paying various other Abakan and MesoCoat expenses.  The proceeds of these securities transactions were also used to make payments on Miller's personal credit cards, and to fund investments on Miller's behalf in Company B, a Miller business venture unrelated to Abakan.

55.     During the Relevant Period, Abakan's primary bank balance was near zero or overdrawn on numerous occasions.  Without the influx of proceeds from these unregistered offerings, in many cases, Abakan would not have had the funds to pay the aforementioned sums, including those paid to Miller or for his benefit.

## III.     UNREGISTERED OFFERINGS THROUGH GREEN CHIP

56.     By September 2013, Abakan was experiencing financial distress from delays commercializing its technologies, from a substantial drop in Abakan's stock price, and from acrimony with major creditors over Abakan's failure to repay senior debt at maturity.

57.     To raise desperately needed funds to pay Abakan expenses, Miller arranged for

Green Chip to obtain high-interest loans from an investment firm (hereinafter "Lender A" or "the Investment Firm"), using Green Chip's purportedly unrestricted Abakan shares as collateral.

58.     Lender A was willing to extend loans to a non-affiliated third-party shareholder of Abakan, with the loans secured by unrestricted Abakan shares and explicitly repayable either in cash or by liquidating the collateral (i.e., the pledged Abakan shares) and offsetting the proceeds of those sales against the outstanding amounts owed.

59.     Lender A demanded unrestricted shares, so that the firm could liquidate those shares at any time without being subject to the holding period requirements of Rule 144 applicable to restricted shares.  Lender A's ability to so proceed depended on Green Chip's assurances that it was not affiliated with Abakan or with any Abakan affiliates.  The Investment Firm conditioned its loans accordingly.

60.     Even though the loans were to be taken out and collateralized by Abakan shares held in the name of Green Chip, Miller controlled all aspects of these loans:

- Miller located, and initiated the relationship with, Lender A;

- Miller negotiated the terms of the deals with the Investment Firm (along with another Abakan consultant);

- Miller identified which tranche of Abakan shares held by Green Chip would be used as collateral on each transaction;

- Miller drafted much of the correspondence between Green Chip and Lender A;

- Miller sent those drafts to the Uruguayan Accountant via an encrypted email address for her signature and for forwarding to the correct parties via email addresses Miller provided her;

16

- On each occasion, Miller or another Abakan consultant provided or caused to be provided the final transaction documents to the Uruguayan Accountant for her signature.

61. Documentation for each of the loans included agreements, negotiated and agreed to by Miller, which represented to Lender A that neither Green Chip, nor its officers, directors, partners, controlling persons or affiliates was an affiliate of Abakan.

62. Miller knew, or at best recklessly disregarded, that these statements, which Miller negotiated and directed the Uruguayan Accountant to sign, were false.

63. Proceeds from each loan were immediately transferred to or on behalf of Abakan.

64. The origination fee for the first loan was not even paid by Green Chip (which appears never to have had a bank account), but instead by Uruguayan Front River Fish using Abakan stock sale proceeds it had just realized in its Liechtenstein account. That origination fee was disbursed over the Uruguayan Accountant's signature, and despite the fact that River Fish had no apparent connection to the Green Chip loan transaction.

65. Green Chip and the Investment Firm ultimately entered into three such arrangements, which collectively raised more than $1.2 million in proceeds between November 2013 and March 2015.

66. Green Chip repaid Lender A approximately $100,000 in cash, and the remainder by transferring what were purported to be unrestricted Abakan shares.

67. Lender A deposited and resold 1,213,316 shares of Abakan generating $1,214,316 between February 2014 and March 2015 in public market sales. All of the aforementioned sales of the collateral shares occurred within six months of transfer by Green Chip to Lender A.

68. None of these transactions was registered with the Commission.

17

69.     Furthermore, because Lender A in fact acquired Abakan securities from an affiliate of Abakan—Green Chip—Lender A did not acquire unrestricted shares, and therefore those shares could not be freely sold to the public without registration or pursuant to an exemption or the safe harbor of Rule 144.

70.     Lender A did not satisfy the requirements of Rule 144 when it resold those shares.

71.     Lender A acquired its securities from an affiliate of the issuer, and Lender A acted as a statutory underwriter when it resold those shares to the public.

72.     The public resales violated Section 5 of the Securities Act.

73.     Miller was a necessary participant and substantial factor in those unlawful resales in violation of Section 5.

## IV.     UNREGISTERED OFFERINGS OF ABAKAN SHARES USING FERRIS

74.     Ferris was an investor relations consultant for Abakan who had invested in prior Miller business ventures.  By the fall of 2013, as described in the preceding section, Abakan desperately needed additional capital to pay its ongoing expenses.  To satisfy this need and keep Abakan operating, Miller orchestrated several transfers of shares from the Uruguayan Fronts to Ferris, who thereafter sold the shares publicly and applied the proceeds at Miller's direction.

75.     Based on his employment with Abakan and daily interactions with Miller, Ferris knew Abakan was in constant need of funds to pay expenses and fund development of the company's technology, and that Miller was using Abakan stock sales by the Uruguayan Fronts to fund the company.

76.     In at least two episodes between September 2013 and October 2014, Miller orchestrated transfers of blocks of purportedly unrestricted Abakan shares from different Uruguayan Fronts to Ferris.  Ferris deposited the shares into his brokerage accounts, by means of

false statements from Miller representing that the Uruguayan Fronts from which Ferris obtained

the shares were unaffiliated with Abakan. Ferris then offered and sold the shares into the public

market, and at Miller's direction used the proceeds to pay Abakan's expenses and debts. In total

during this period, Ferris publicly offered and sold 338,333 Abakan shares in transactions for

which no exemption applied.

77.     On September 23, 2013, Miller arranged for Ferris to purchase 133,333 Abakan

shares from Green Chip. Every detail of the transaction was negotiated by Miller; neither the

Uruguayan Accountant nor any individual other than Miller communicated with Ferris on Green

Chip's behalf.

78.     Ferris immediately sought to deposit these shares into his brokerage account.

79.     As part of its compliance and gatekeeping responsibilities under Section 5, Ferris'

broker requested information about the source of these shares, and the relationship of Green Chip

to Abakan.

80.     In response, Ferris submitted several documents drafted by Miller, including

letters from both Ferris and Green Chip detailing the terms of the transaction. Miller also wrote

a letter to the brokerage firm on Abakan's letterhead tracing the lineage of the shares Ferris was

attempting to deposit.

81.     The aforementioned Miller letter to the brokerage firm on Abakan's letterhead

stated only that Green Chip "is known to management." However, that proved insufficient for

the brokerage's compliance department, since it did not address the critical issue of whether

Green Chip was an Abakan affiliate; so one week later Miller signed a revised letter adding,

"Green Chip SA has never been an affiliate nor a control entity of Abakan Inc."

82.     Miller knew, however, or at best recklessly disregarded, that this statement was

false, since Green Chip and Abakan were under Miller's common control.  Ferris emailed the

aforementioned revised Miller letter to the firm with the subject line "non-affiliate;" and the firm

accepted the 133,333 shares for deposit into Ferris's account later the same day.

83.     In fact, Miller beneficially owned those shares.  Acting at Miller's direction,

Ferris applied the sales proceeds according to Miller's wishes to benefit Abakan.  Thus, when the

broker sold the Abakan shares out of Ferris' brokerage account to public investors, the broker

was acting as a statutory underwriter selling shares on behalf of Abakan in illegal unregistered

transactions.

84.     Ferris acquired his Abakan shares from an affiliate of Abakan (Green Chip) and

thus held restricted securities.

85.     Ferris began liquidating these shares immediately and sold all of them by early

March 2014.  Ferris did so at Miller's direction and used the proceeds to pay specific Abakan

bills that Miller identified to Ferris, and for which Miller provided Ferris the creditor name, the

amounts due, and the wiring or payment instructions.

86.     The aforementioned sales did not comply with the safe harbor of Rule 144 for the

public resale of restricted securities by affiliates, and were not registered.

87.     On January 15, 2014, Miller again caused Stratton to transfer 205,000 Abakan

shares to Ferris.  Once again, every detail of the transaction was dictated by Miller, and neither

the Uruguayan Accountant nor any individual other than Miller communicated with Ferris on

behalf of Stratton.  Ferris again immediately submitted paperwork to deposit the shares into his

brokerage account.  The brokerage again requested supporting documentation detailing the

transaction and the lineage of the shares sought to be deposited and sold by Ferris.

88.     Once again, Miller signed a letter on Abakan letterhead tracing the provenance of

the shares Ferris was attempting to deposit.  Regarding Stratton's relationship to Abakan, Miller's letter again stated only that Stratton was "known to management."  In response, the brokerage firm told Ferris, "What we need to confirm is whether they [Stratton] should be deemed a controlling entity or affiliate to Abakan," and suggested that Stratton submit a letter specifically explaining whether it was an affiliate.

89.     Ferris forwarded this message to Miller who drafted a letter on Stratton letterhead stating, "Although Stratton SA is known to the management of Abakan, Inc., Stratton SA is not and never has been an affiliated entity of the issuer."  Miller sent this draft letter to the Uruguayan Accountant with instructions to sign it and to send it directly to the broker "so that Steve Ferris can deposit his shares."  The Uruguayan Accountant complied.

90.     Upon receipt of the letter, the broker then accepted the shares for deposit into Ferris's account.  Ferris began liquidating the shares immediately, although there were other Abakan shares present in the account.  Using a First In First Out ("FIFO") method, which is how Ferris elected for his brokerage account to be treated, Ferris sold approximately 139,000 shares by July 15, 2014 (i.e., within six months).  The balance of the Abakan shares (66,000) was sold by August 22, 2014.

91.     When Ferris acquired, deposited, and publicly sold these Abakan shares obtained from the Uruguayan Fronts, he did so at Miller's direction. These sales did not satisfy the terms of the Rule 144 safe harbor and were not registered.

92.     The sale of the 338,333 Abakan shares generated gross proceeds of about $245,000.  At Miller's direction and with Miller's knowledge, Ferris used these funds in part to make over $131,000 in payments to or on behalf of Abakan, including $70,000 wired directly to Abakan's sole operating subsidiary, MesoCoat, and almost $28,000 in payments to Abakan's

consultants and trade creditors, including for important expenses such as Abakan's directors and officers insurance and the electric bill for MesoCoat.  In addition, Ferris wired over $30,000 to Company B, an unrelated Miller venture, at Miller's instruction (the company Miller said he could only fund through Abakan stock sales).  Finally, Ferris used $163,000 of Abakan stock sale proceeds to purchase outstanding debts that Abakan owed to a creditor.

93.     The amount of payments identified is greater than the $245,000 in illicit sales proceeds because Ferris held and sold other Abakan shares in addition to those obtained from the Uruguayan Fronts.

## V.     ABAKAN AND MILLER MADE FALSE AND MISLEADING PUBLIC DISCLOSURES ABOUT MILLER'S BENEFICIAL OWNERSHIP OF AND TRADING IN ABAKAN SECURITIES HELD BY THE URUGUAYAN FRONTS

94.     During its existence as a public company, Abakan falsely stated in six publicly-filed annual reports on Form 10-K that Miller's beneficial ownership was limited to a 35-40% stake in the company's securities, and did not disclose Miller's beneficial ownership of and trading in Abakan shares held by the Uruguayan Fronts, many of which did not carry restrictive legends.

95.     For example, in each of the Forms 10-K filed for fiscal years 2013 through 2015, the beneficial ownership tables disclose Miller's beneficial ownership as a steady 24.1 million shares, equating to between a 35-38% interest.

96.     Miller was intimately involved in the drafting of Abakan's SEC filings, and signed every one as the CEO and a Director, as well as the CFO during the periods when he served in that role.  Miller also signed the certifications required pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act for all Forms 10-K.  The six Forms 10-K that Miller signed, including three within the limitations period, were all materially deficient because they misstated

or omitted required disclosures concerning the beneficial ownership of Abakan's shares (Item 403 of Reg. S-K), related party transactions (Item 404 of Reg. S-K), and compliance with Exchange Act Section 16(a) (Item 405 of Reg. S-K).  In addition, for each such filing, Miller provided false certifications under Section 302 and 906 of the Sarbanes-Oxley Act.

97.     These disclosures were false and misleading because they failed to disclose Miller's beneficial ownership and control over the Uruguayan Fronts, and Abakan securities held by them, and, as explained further below, failed to disclose when he orchestrated offers and sales of those securities.

98.     For example, the beneficial ownership table in each 10-K reflected that Miller beneficially owned between a 35-38% interest in Abakan securities.  In reality, however, Miller beneficially owned at least an additional approximately 5-11% of Abakan shares at various points.  Many of those undisclosed shares bore no restrictive legends, and Miller was monetizing the shares by, among other things, using the shares as collateral for loans that would be repaid through Abakan share liquidations, and transferring shares to Ferris with instructions to deposit and sell the shares to pay Abakan expenses and make other payments on behalf of Abakan.  As of August 2013, Miller's undisclosed beneficial ownership included, at least, the following:

| Miller Undisclosed Shareholdings as of August 2013 | | | |
|---|---|---|---|
| Shareholder | Total | % Issued | % Public Float |
| Stratton S.A. | 2,667,411 | 4.15% | 6.42% |
| Green Chip S.A. | 2,585,895 | 4.02% | 6.22% |
| River Fish Holdings, Ltd. | 1,899,847 | 2.96% | 4.57% |
| Total: | 7,153,153 | 11.13% | 17.21% |

99.     The Forms 10-K filed during the Relevant Period also failed to disclose material related party transactions between Abakan and the Uruguayan Fronts.  Generally transactions

between an issuer and a related party must be disclosed if the transaction or series of transactions exceeds $120,000. The transactions by the Uruguayan Fronts, which directly financed Abakan through cash investment or through paying Abakan's bills directly, exceeded this threshold amount in every fiscal year through 2015.

100.    Abakan's Forms 10-K also falsely stated that Abakan was not aware of any instances of persons who had failed to file Section 16(a) reports on a timely basis, other than a single instance of a late filing by one independent director. In reality, Miller failed to file a single Form 4 relating to any of the many transactions in Abakan stock by the Uruguayan Fronts, including, for example, each Abakan stock transaction by the Uruguayan Fronts described in this complaint.

101.    Miller violated Exchange Act Rule 13a-14 by signing false certifications when he knew that Abakan's filings contained untrue statements of material fact relating to his own beneficial ownership of Abakan shares, related party transactions, and compliance with Section 16(a) reporting.

102.    For his part, Miller filed thirteen false and misleading beneficial ownership reports between 2009 and 2015, and failed to disclose Miller's beneficial ownership and trading of the Abakan shares held in the Uruguayan Fronts.

103.    Miller's Schedule 13D and amendments also falsely stated, "Other than as reflected above, the Reporting Person does not have any contracts, arrangements, understandings or relationships with respect to the securities of the Issuer."

104.    Miller also personally failed to file Forms 4 and Schedule 13D amendments to disclose transactions and material changes in ownership by the Uruguayan Fronts.

## VI.    THE COMMISSION'S ACTION IS TIMELY

105.    On September 4, 2018; December 28, 2018; and June 14, 2019, Defendant

entered into agreements tolling the statute of limitations for, respectively, the periods August 24,

2018 through February 24, 2019; February 25, 2019 through June 25, 2019; and June 26, 2019

through September 24, 2019.  Each tolling agreement specifies a period of time (a "tolling

period") in which "the running of any statute of limitations applicable to any action or

proceeding against [Defendants] authorized, instituted, or brought by … the Commission…

arising out of the [Commission's investigation of Defendants' conduct], including any sanctions

or relief that may be imposed therein, is tolled and suspended . . . ."  Each tolling agreement

further provides that the Defendant "shall not include the tolling period in the calculation of the

running of any statute of limitations or for any other time-related defense applicable to any

proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying

upon any such time-related defenses."

106.    Collectively, these agreements tolled the running of any limitations period or any

other time-related defenses available to the Defendant for a period of eleven months, thereby

preserving the timeliness of the Commission's claims that arose after August 24, 2013.

Abakan's Form 10-K for the fiscal year ended May 31, 2013 was filed with the Commission on

August 29, 2013.

### FIRST CLAIM
### [Securities Fraud]
### Violations of Securities Act Section 17(a)

107.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 106 above as if set forth fully herein.

108.    By engaging in the conduct described above, Defendant Miller, in the offer or sale

of securities, and by the use of means or instruments of transportation or communication in

interstate commerce or by use of the mails, directly or indirectly:  (1) while acting knowingly or

recklessly, employed devices, schemes, and artifices to defraud; (2) while acting knowingly,

recklessly, or negligently, obtained money or property by means of untrue statements of a

material fact or by omitting to state a material fact necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; and (3) while

acting knowingly, recklessly, or negligently, engaged in transactions, practices, or courses of

business which operated or would operate as a fraud or deceit upon the purchasers of Abakan

stock.

109.    By engaging in the foregoing conduct, Defendant Miller violated, and unless

restrained and enjoined are reasonably likely to continue to violate, Sections 17(a) of the

Securities Act [15 U.S.C. §§ 77q(a)].

**SECOND CLAIM**
**[Securities Fraud]**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

110.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1 through 106 above as if set forth fully herein.

111.    By engaging in the foregoing conduct, Defendant Miller, directly or indirectly, in

connection with the purchase or sale of a security, by the use of means or instrumentalities or

interstate commerce, of the mails, or of the facilities of a national securities exchange, with

scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a

material fact or omitted to state a material fact necessary in order to make the statements made,

in the light of the circumstances under which they were made, not misleading; and (c) engaged in

acts, practices or courses of business which operated or would operate as a fraud or deceit upon

the purchasers of Abakan stock, and other persons.

112.    By engaging in the foregoing conduct, Defendant Miller violated, and unless restrained and enjoined are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM**
**[Offering of Unregistered Securities]**
**Violations of Securities Act Sections 5(a) and 5(c)**

113.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 106 above as if set forth fully herein.

114.    Abakan's common stock constitutes a "security" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

115.    The aforementioned offers and sales of Abakan shares were not registered in accordance with the provisions of the Securities Act and no exemption from such registration was applicable.

116.    By reason of the foregoing, Defendant Miller, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities when no registration statement had been filed or was in effect as to such securities and when no exemption from registration was available.

117.    By reason of the forgoing, Defendant Miller has violated, and unless enjoined and restrained by this Court will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## FOURTH CLAIM
### [Making False Annual Report Certifications]
### Violations of Exchange Act Rule 13a-14

118.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 106 above as if set forth fully herein.

119.    As described above, Defendant Miller falsely stated in certifications he submitted with Abakan's annual reports on Form 10-K for its 2013 through 2015 fiscal years that, among other things, the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

120.    By reason of the foregoing, Defendant Miller violated, and unless enjoined and restrained by this Court will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## FIFTH CLAIM
### Violations of Exchange Act Section 13(d)
### And Rules 13d-1 and 13d-2 thereunder

121.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 106 above as if set forth fully herein.

122.    Pursuant to Exchange Act Section 13(d) and Rules 13d-1 and 13d-2 thereunder, persons who are directly or indirectly the beneficial owners of more than 5% of the outstanding shares of a class of voting equity securities registered under the Exchange Act are required to file a Schedule 13D within ten days of the date on which their ownership exceeds five percent, and to notify the issuer and the Commission of any material increases or decreases in the percentage of beneficial ownership by filing an amended Schedule 13D.  The Schedule 13D filing requirement applies both to individuals and to two or more persons who act as a group for the purpose of

acquiring, holding, or disposing of securities of an issuer.

123.     Defendant Miller was beneficial owner of more than 5 percent of Abakan's shares beginning from its inception and continuing until it ceased to be publicly traded.  In addition to the Abakan stock Miller reported as beneficially owning (held in the name of his wife, a trust for his children, and a Canadian charity he controlled), Defendant Miller was also a beneficial owner of the Abakan stock held in the Uruguayan Fronts, as a result of the investment authority that Defendant Miller, for reasons set forth more fully above, held over those Abakan securities.

124.     Accordingly, Defendant Miller was under an obligation to file with the Commission true and accurate reports with respect to his beneficial ownership of Abakan securities, including those held in the Uruguayan Fronts, as well as any material increases or decreases in the percentage of such ownership, pursuant to Exchange Act Section 13(d) and Rules 13d-1 and 13d-2 thereunder – but failed to do so.

125.     By reason of the foregoing, Defendant Miller violated, and, unless enjoined and restrained will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 thereunder [17 C.F.R. §§ 240.13d-1 and 240.13d-2].

**SIXTH CLAIM**
**Violations of Exchange Act Section 16(a)**
**And Rules 16a-2 and 16a-3 thereunder**

126.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 106 above as if set forth fully herein.

127.     Pursuant to Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 thereunder, persons who are directors or officers of an issuer of securities registered under the Exchange Act are required timely and accurately to file Forms 3, 4 and 5 with the Commission disclosing information about their holdings and trading in the corresponding issuer's securities.

128.   As set forth more fully above, Defendant Miller violated Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 thereunder because he failed to file Form 4s with the Commission concerning all changes in his beneficial ownership.

129.   By reason of the foregoing, Defendant Miller has violated, and unless enjoined and restrained will continue to violate, Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rules 16a-2 and 16a-3 thereunder [17 C.F.R. §§ 240.16a-2 and 240.16a-3].

### SEVENTH CLAIM
### Aiding and Abetting Violations
### of Exchange Act Section 13(a) and Rules 12b-20 and 13a-1 thereunder

130.   The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 106 above as if set forth fully herein.

131.   Abakan has, by making the annual reports on Form 10-K set forth above, violated Exchange Act Section 13(a) and Rules 12b-20 and 13a-1 thereunder.

132.   As alleged herein, Defendant Miller knowingly provided substantial assistance to Abakan's violations of Exchange Act Section 13(a) and Rule 13a-1 thereunder.  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Miller aided and abetted, and unless enjoined and restrained will continue to aid and abet, said violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. § 240.12b-20 and 13a-1].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission requests that this Court enter a Final Judgment:

A.   Permanently enjoining Defendant Miller from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]);

B.      Permanently enjoining Defendant Miller from violating Securities Act Section 5 [15 U.S.C. § 77e], Exchange Act Sections 13(d) and 16(a) [15 U.S.C. §§ 78m(d) and 78p(a)], and Exchange Act Rules 13a-14, 13d-1, 13d-2, 16a-2 and 16a-3  [17 C.F.R. §§ 240.13a-14, 13d-1, 13d-2, 16a-2 and 16a-3], and from aiding and abetting violations of Exchange Act Section 13(a) and Rules 12b-20 and 13a-1 thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. § 240.12b-20 and 13a-1];

C.      Ordering Defendant Miller to disgorge all ill-gotten gains he received, within five years (as adjusted by the tolling agreements described at Paragraphs 105-106 above) of the filing of this Complaint, as a result of the acts or courses of conduct alleged in this Complaint, plus prejudgment interest;

D.      Ordering Defendant Miller to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), for all violative conduct he committed within five years (as adjusted by the tolling agreements described at Paragraphs 105-106 above) of the filing of this Complaint;

E.      Permanently barring Defendant Miller, pursuant to the Court's authority under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(5)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 78t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

F.      Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court; and

31

G.      Granting such other and further relief as the Court deems just and appropriate or necessary for the benefit of investors.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  September 24, 2019                    Respectfully submitted,

                                                            SECURITIES AND EXCHANGE COMMISSION

                                                            By:      /s/ *Gregory Bockin*
                                                                        Gregory R. Bockin
                                                                        John P. Lucas
                                                                        U.S. Securities and Exchange Commission
                                                                        100 F. Street, N.E.
                                                                        Washington, D.C.  20549
                                                                        Tel:  (202) 551-5684 (Bockin)
                                                                        Email: BockinG@sec.gov