IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *     Civ. No. DLB-19-2810 |
| | * |
| ROBERT HILLIS MILLER, | * |
| | * |
| Defendant. | * |
| | * |

**MEMORANDUM OPINION**

This is a civil enforcement action filed by the United States Securities and Exchange Commission ("SEC") against defendant Robert Hillis Miller. The agency alleges Miller violated provisions of the Securities Act of 1933, 15 U.S.C. §§ 77a – 77aa, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a – 78qq, and seeks monetary penalties among other relief. ECF 1. Each alleged violation turns on whether Miller had "beneficial ownership" of certain securities issued by his company Abakan, Inc. ("Abakan") and registered to three Uruguayan entities. Miller now moves for summary judgment. ECF 50. He argues that the SEC, in seeking monetary penalties against him, violated his due process rights by failing to provide adequate pre-enforcement notice that his alleged conduct constituted beneficial ownership. Miller's motion is ripe. ECF 60 & 61. No hearing is necessary. Loc. R. 105.6 (D. Md. 2021). For the following reasons, the motion is denied.

**I.  Background**

Miller is the former Chief Operating Officer of Abakan, a publicly traded company. ECF 60-2, at 14, 18, 20. Abakan's business involved the design and production of "advanced nanocomposite materials, innovative fabricated metal products, highly engineered metal

composites, and engineered reactive materials[.]" *Id.* at 14.  In 2013, Miller disclosed beneficially owning 22 million Abakan shares, more than 30 percent of the outstanding common stock.  *Id.* at 18.  Generally, a beneficial owner of a security is any person who, directly or indirectly, has or shares voting or investment power over it.  *See* 17 C.F.R. § 240.13d–3(a); ECF 60-2, at 190.  A beneficial owner is not necessarily the registered or legal owner.  ECF 60-2, at 190.  According to Arthur Laby, an expert retained by the SEC, the accurate disclosure of beneficial ownership of securities by company insiders is important for at least two reasons.[1]  First, such securities are restricted and cannot be resold by a purchaser for at least six months.  *Id.* at 185–88, 194–95.  This greatly reduces their value.  *Id.*  Second, knowledge that an executive like Miller is selling company stock that he beneficially owned can impact perceptions of the company.  *Id.* at 188, 215; *see also id.* at 221–22 (deposition of Abakan investor Steven Zielske).

According to the SEC, Miller failed to disclose that he beneficially owned additional shares of Abakan stock via relationships and agreements with three Uruguayan entities—River Fish Holdings, Ltd. ("River Fish"); Stratton, S.A. ("Stratton"); and Green Chip, S.A. ("Green Chip") (collectively, "the Uruguayan entities")—and with persons affiliated with those entities, including Maria Dolores Longo, Miller's ex-wife, and Manon Lecueder, a longtime friend of Longo and Miller.  A foundation created by Longo's mother ran River Fish, with Longo's help.  ECF 60-2, at 121–22, 128, 131.  Lecueder was a director of River Fish with signatory authority.  *Id.* at 108–09, 131–32.  Separately, Lecueder administered Green Chip through her accounting firm.  *Id.* at 28.

---

[1] Miller moves to exclude Laby's testimony and report for failing to satisfy the requirements of *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence.  ECF 49.  The Court reserves judgment on that motion.  It cites Laby's report only as a convenience to summarize the import of beneficial ownership.  Even if the Court excluded Laby's testimony and report at this time, it would not affect the Court's decision to deny summary judgment.

Longo served as an officer and director of Green Chip on paper, but she testified that she had no knowledge of the company's assets and was there as a convenience in case a signature was needed. *Id.* at 123–25. The women played similar roles for Stratton as they did for Green Chip, with Lecueder in control and Longo with signatory authority. *Id.* at 30, 108–09, 126. Each of the three companies received a significant number of Abakan shares at little to no cost. *Id.* at 31–37.

The SEC's theory is that Miller had the power through his relationships with Longo and Lecueder to direct the disposition of the Abakan shares held by the Uruguayan entities and funnel the proceeds back to himself or entities he controlled. In support of this theory, the SEC highlights evidence consisting of (1) statements made by Miller that indicate his control of the shares held by Stratton; (2) evidence regarding Miller's orchestration of 2013–2014 transactions between Green Chip and Steven Ferris, an employee of Abakan; and (3) evidence regarding Miller's orchestration of 2013–2014 transactions between Green Chip and Yorkville Advisors Global, LP ("Yorkville").[2]

First, Miller's statements. The SEC deposed Miller in 2021 about several matters, including prior deposition testimony he gave on May 22, 2002 in a different civil case. ECF 60-2, at 22–95. In the 2002 deposition, Miller discussed the "Miller group," a group of accounts over which he allegedly had authority, and identified himself as the "leader of the Miller group." ECF 60-3, at 188–92. In the 2021 deposition, Miller was asked about the makeup of the "group" and whether it included Stratton. ECF 60-2, at 88. He responded, "Probably, yeah." *Id.* Separately, a former business partner of Miller, Paul Leonard, provided a declaration in which he stated that in 2008 or 2009 Miller told him

---

[2] The SEC also provides evidence that between 2011 and 2014, River Fish sold nearly one million Abakan shares and sent a large portion of the proceeds to Abakan, Abakan's auditor, or other companies associated with Miller. ECF 60-2, at 70–74, 134–38, 238–61; ECF 60-3, at 12–14. The SEC does not provide a similarly detailed walkthrough of how Miller may have orchestrated these transactions as it does for the other highlighted transactions.

> how he conducted his business and managed his personal finances. Miller explained that he has several offshore companies and entities that he uses. Miller said he used proxies outside the United States to hold large bundles of shares so that transactions involving those shares would not be visible. Miller said his offshore entities were located in Uruguay, and were controlled by his father-in-law "Gustavo." I recall one of those entities was known as "Stratton." Miller described this arrangement as "much safer" than using nominee corporate directors to control offshore assets because they could "screw you." Miller stated to me on multiple occasions that due to this arrangement he was "judgment proof." Miller said he maintained control over the shares he held in Uruguay, however he said that, "If I run into problems, I know that in this way my kids will have the benefit of the assets."

ECF 60-3, at 183.

Next, the Ferris transactions. In brief, the SEC suggests Miller orchestrated the sale of shares held by Green Chip to Steven Ferris, an Abakan employee and associate of Miller, for Ferris to resell and transfer the proceeds back to Abakan. The SEC highlights statements in a June 2021 declaration by Ferris. Ferris met Miller in 2004 or 2005. ECF 60-2, at 171. He was given 50,000 Abakan shares around 2009 as compensation for a previous failed investment made with Miller, and he began to work "as a consultant in an investor relations role" for Abakan in 2012. *Id.* at 171–73. Ferris stated that Miller used "at least two Uruguayan entities, Stratton, S.A.[,] and Green Chip, S.A., whose Abakan shares [Miller] controlled to fund Abakan operations." *Id.* at 174. He explained:

> Through my work at Abakan, conversations with Miller and transactions with these entities, I was aware that another person in Uruguay named Manon Lecueder ("Lecueder") that Miller had known for many years was also involved in administering these companies and their shares. The way this worked was that when he established Abakan, Miller had shares registered in the names of these Uruguayan entities, among others. I learned during my time at Abakan that these Uruguayan entities paid very little for their shares. Miller would direct his ex-wife Dolores Longo ("Longo") to sell Abakan shares into the open market, and Miller would direct the proceeds from the sale of shares back into Abakan, to pay bills or wherever he wanted the money to go. Miller told me that he did not have to be the one making the call to the broker, which I understood meant he was acting through others. He also told me that there was nothing on paper that could connect him to these Uruguayan entities.

4

> . . .
>
> Eventually, Longo's broker shut down her ability to sell Abakan shares, as Miller told me. He explained that it was because of concerns raised by the broker's compliance department about Longo's activities involving the sale of Abakan shares followed by wires to Abakan. Miller complained that this was not smart and that Longo should have wired the Abakan stock sale proceeds from the brokerage account to a bank account first before sending it to Abakan.

*Id.* at 174. Once Miller could no longer use Longo to sell shares, according to Ferris, he asked Ferris to fill in for her. *Id.* at 175. Ferris recalled that "Miller structured ways for [him] to fund Abakan by obtaining free trading shares from Stratton S.A. and Green Chip S.A.[,]" selling those shares on the market, and using the proceeds to "pay a variety of bills for Abakan's operating expenses[.]" *Id.* at 175–76. Ferris negotiated only "with Miller to purchase the Abakan shares from Stratton S.A. and Green Chip S.A." *Id.* at 175. He never met or spoke to Lecueder. *Id.* at 175–76. Notably, Miller testified Lecueder spoke very little English and could not edit a legal document in English. *Id.* at 25–26.

Ferris stated that a specific September 2013 Abakan stock purchase he made from Green Chip was orchestrated by Miller. *Id.* at 175. The SEC submits a host of emails and documents from 2013 and 2014 regarding this transaction that appear to support the SEC's contention that Miller used Ferris to sell Abakan shares and direct the proceeds to companies affiliated with Miller. *See* ECF 60-2, at 15, 56; ECF 60-3, at 17–18, 30, 45–46, 53, 67, 70–74, 83, 163–64, 234. Ferris testified that after he "received the Abakan shares from Stratton S.A. and Green Chip S.A., Miller asked [him] to sell the shares and use the proceeds to pay a variety of bills for Abakan's operating expenses, including ceramics companies, plastic fabricators, employee wages, and utilities payments." ECF 60-2, at 176. "Miller assisted [him] with depositing the shares to [his] accounts by writing letters to [his] brokers concerning the origins of the shares, including representations

5

Case 8:19-cv-02810-DLB   Document 62   Filed 11/01/22   Page 6 of 18

that the entities [Ferris] received the shares from were not affiliated with Abakan." *Id.* Ferris also "submitted expenses reports to Abakan for reimbursement of costs associated with [his] deposit and sale of the shares, including fees for compliance department review of the share deposits and fees for wire transfers of the sale proceeds." *Id.*

Finally, the Yorkville transactions. The SEC also provides evidence of another set of share transactions orchestrated by Miller. In these transactions, Yorkville provided a loan to Green Chip with Abakan shares as collateral, and the loaned funds were sent to Abakan or otherwise used to benefit it or other companies associated with Miller. The record contains a declaration from Troy Rillo, an employee at Yorkville who also served as Yorkville's Chief Compliance Officer from December 2014 until April 2021. ECF 60-3, at 85. In the second half of 2013, Rillo "became aware of Abakan" and Miller "in connection with Miller's efforts to raise capital for Abakan." *Id.* at 86. According to Rillo:

> In October 2013, following negotiations with Miller, Yorkville produced a term sheet proposing to enter into a note for $500,000 with Green Chip. The term sheet stated, among other things, that the note could be repaid in either cash or free trading Abakan shares; that the note would be secured by free trading Abakan shares representing three times the note amount; and that the Fund would receive options to purchase $200,000 worth of additional free trading shares from Green Chip during the next twelve months at a 20% discount to market price per share. The use of proceeds for the note was to fund Abakan.

*Id.* at 86–87. Yorkville and Green Chip closed the $500,000 note on November 6, 2014, and "[t]he net proceeds of the note, totaling $477,500 after fees, were wired to Abakan via Green Chip's escrow attorney." *Id.* at 88. According to November 4 and 6, 2013 letters signed by Lecueder, she requested the wire transfer of the net proceeds to Abakan. *Id.* at 169–170.

In a related collateral assignment and security agreement, "Abakan 'reaffirm[ed], acknowledge[d] and agree[d] that" Green Chip's officers, directors, shareholders, members, partners, controlling persons, or affiliates were not affiliates of Abakan. *Id.* Green Chip signed a

6

similar acknowledgement. *Id.* As the first repayment installment's due date approached, "Miller negotiated an amendment . . . whereby Green Chip would satisfy the first scheduled payment through delivery of 265,000 Abakan shares." *Id.* at 89. And, when Yorkville exercised a $100,000 option given with the note to purchase shares of Abakan, "[t]he funds were sent directly to Abakan's operating subsidiary MesoCoat Inc." *Id.* at 90. A May 29, 2014 email from Lecueder to Yorkville email addresses shows she requested that the funds be sent to MesoCoat. *Id.* at 172. Green Chip and Yorkville later closed another note, the proceeds of which totaled $200,000, which were wired "directly to Abakan's operating subsidiary MesoCoat Inc." *Id.* at 92. In all, "Green Chip partially repaid its obligations to satisfy the . . . investment by transferring approximately 1.5 million Abakan shares." *Id.* at 93.

The SEC filed its complaint on September 24, 2019. ECF 1. Miller's motion to dismiss the complaint was denied. ECF 13. After the close of discovery, Miller filed the pending motion for summary judgment. ECF 50. He asserts legal and factual defenses to the charges. He argues principally that he is entitled to judgment as a matter of law because the SEC did not give him fair pre-enforcement notice that his alleged conduct could amount to beneficial ownership of Abakan shares. As a factual defense, he argues he did not beneficially own the Abakan shares held by the Uruguayan entities. He represents that he gave the shares to people and entities he wanted to be associated with Abakan when the company was new and the shares were nearly worthless. He claims this is a common practice with new companies. Miller does not support his factual allegations with evidence. He provides only the SEC's complaint, the agency's answers to his requests for admission and interrogatories, and a letter from the SEC's counsel addressing certain issues raised at a December 2020 meeting. *See* ECF 50-2, 50-3, 50-4, & 50-5.

**II.     Standard of Review**

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted). However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor. *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). "Instead, the nonmoving party must establish that a material fact is genuinely disputed by, inter alia, 'citing to

8

particular parts of the materials of record.'" *United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(c)(1)(A)).

## III.    Discussion

Miller contends that the SEC denied him due process by failing to provide sufficient pre-enforcement notice that his alleged conduct constituted beneficial ownership. He argues that the regulation that defines beneficial ownership does not itself provide adequate notice of what conduct it reaches. He further contends that the SEC has previously established beneficial ownership by reference to "objective indicia of ownership," which he claims the SEC conceded in its answers to interrogatories it does not have in this case. Rather than rely on "objective indicia of ownership," the SEC intends to rely on the "totality of the circumstances" to prove Miller was a beneficial owner of the Abakan shares. Miller views this standard as too vague and imprecise to pass constitutional muster.

"The void for vagueness doctrine is rooted in the Due Process Clause[s] of the Fifth and Fourteenth Amendments." *United States v. Comer*, 5 F.4th 535, 541 (4th Cir. 2021) (quoting *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019)). "It is principally concerned with providing individuals with adequate notice of what conduct they cannot engage in and with delineating clear limits on the enforcement power of the state." *Id.* (citing *United States v. Van Donk*, 961 F.3d 314, 324 (4th Cir. 2020)). The doctrine requires that governments provide fair notice before depriving individuals of life, liberty, or property, and it applies to both criminal and civil enactments. *See, e.g.*, *Johnson v. United States*, 576 U.S. 591, 595 (2015); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212–13 (2018).

"The degree of vagueness that the Constitution [allows] depends in part on the nature of the enactment." *Sessions*, 138 S. Ct. at 1212 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman*

9

*Ests., Inc.*, 455 U.S. 489, 498–99 (1982)). The regulation at issue here permits monetary penalties against violators, so it "must give fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997) (quoting *First Am. Bank v. Dole*, 763 F.2d 644, 651 n.6 (4th Cir. 1985)) (internal quotation marks omitted); *see also United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 322 (4th Cir. 2018) (noting that *Hoechst Celanese* is instructive in "the context of regulatory provisions"). In other words, a "punishment fails to comply with due process if the . . . regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

This is not a high bar. "[B]ecause we are 'condemned to the use of words, we can never expect mathematical certainty from our language.'" *Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health and Envt'l Control*, 317 F.3d 357, 366 (4th Cir. 2002) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). Nor must a law "spell out every possible factual scenario with 'celestial precision' to avoid being struck down on vagueness grounds." *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013) (quoting *United States v. Whorley*, 550 F.3d 326, 334 (4th Cir. 2008)). This is because "[w]hat renders a [law] vague . . . is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of what that fact is." *Williams*, 553 U.S. at 306; *see also Fox Television Stations*, 567 U.S. at 253 (referencing this rule in evaluating an as-applied challenge).

When deciding whether a law is void for vagueness, the Fourth Circuit has considered the challenged words and whether the scheme provides a definition of arguably ambiguous terms. *See, e.g.*, *Manning*, 930 F.3d at 274. In *Manning*, the Fourth Circuit found a Virginia law authorizing criminal punishment of "habitual drunkards" was void for vagueness. *Id.* at 274–78. It consulted Webster's International Dictionary for a definition of habitual and habit, which did "not provide any principles or standards for determining how often or regularly an act must be performed to constitute 'habitual' behavior." *Id.* at 274. As to the meaning of "drunkard," the court looked to Black's Law Dictionary, which defined the term by reference to excessive intoxication. *Id.* at 275. Because those and other sources failed to adequately define the scope of criminal conduct with respect to drinking, the Fourth Circuit found the law "plainly fail[ed] to give fair notice of the conduct to be avoided." *Id.* at 274–77.

In contrast, the Fourth Circuit recently held a probation condition stating that the probationer "shall not have any social networking accounts without the approval of [her] U.S. Probation Officer" was not unconstitutionally vague. *Comer*, 5 F.4th at 539, 542. The Court reasoned that while the condition had "some gray space on the margins as to what activity the social networking restricts," it nonetheless provided "the requisite 'commonsense understanding' of what activity [the probationer] may not [have] engage[d] in without the permission of her probation officer." *Id.* at 542 (citing *United States v. Hamilton*, 986 F.3d 413, 420 (4th Cir. 2021)). "Drawing on the ordinary meaning of the term as informed by dictionaries," the Court understood "a 'social networking account' to be an account on a website or app that is primarily intended to facilitate social introductions between two or more persons through the use of personal profiles for the purposes of friendship, meeting others, or information exchanges." *Id.* "Thus, the commonsense meaning of the condition [was] that Comer may not have [had] any social

11

networking accounts, so defined, without her probation officer's permission." *Id.* That the term "carrie[d] with it a commonsense meaning . . . temper[ed] any concern that the social networking condition [was] unconstitutionally vague." *Id.* at 543.

Miller challenges the SEC's regulation that defines beneficial ownership, Rule 13d–3, which states:

> For purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or; (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d–3(a).[3]

The only term in the Rule that Miller takes direct aim at is "power." He argues the regulation does not identify or explain the conduct that would establish the existence of "power." Power is defined in Black's Law Dictionary as "[t]he ability to act or not act; esp[ecially] a person's capacity for acting in such a manner as to control someone else's responses." *Power*, Black's Law Dictionary (11th ed. 2019). Merriam-Webster's dictionary defines power as "ability to act or produce an effect." These definitions reflect the commonly understood meaning of the word—namely, ability. So, the regulation covers, *inter alia*, conduct demonstrating the ability to direct the disposition of securities. This is more than sufficient clarity to provide "fair notice" to regulated parties and a "reasonably clear standard of culpability." *See Hoechst Celanese Corp.*, 128 F.3d at 224. Rule 13d–3 is closer to the challenged probation condition upheld in *Comer* than

---

[3] "Regulatory interpretation is a question of law." *United States v. Moriello*, 980 F.3d 924, 934 (4th Cir. 2020). "This Court construes a regulation using the same rules applicable to statutory construction." *Id.* (citing *Harris v. Norfolk S. Ry. Co.*, 784 F.3d 954, 962 (4th Cir. 2015)). "If the language of the regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as written." *Id.* (citing *Gilbert Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012)).

to the vague criminal statute struck down in *Manning*. It passes constitutional muster because it sets out in ordinary terms the factual conditions that give rise to beneficial ownership.

Even if Miller did not subjectively understand his conduct could amount to beneficial ownership, a person of ordinary intelligence, particularly someone with years of experience in the securities industry, would have understood that Rule 13d–3 reaches conduct demonstrating the ability to direct the disposition of securities. As the SEC points out, previous judicial decisions are consistent with this understanding of Rule 13d–3 and bear upon whether Miller had reasonable notice of the meaning of the regulation. *See United States v. Lanier*, 520 U.S. 259, 267 (1997) ("[T]he touchstone is whether the [law], either standing alone or as construed [by courts], made it reasonably clear at the relevant time that the defendant's conduct was [prohibited]."). Courts previously have held that "Rule 13d–3 casts a wide net in prescribing the sorts of activity that will qualify one as a beneficial owner of an equity security" and "focuses on the person who can actually vote [or control] the shares, rather than the record owner of the stock." *Rosenberg v. XM Ventures*, 274 F.3d 137, 143–44 (3d Cir. 2001) (citing cases). The concept of beneficial ownership "focuses on any relationship that, *as a factual matter*, confers on a person a significant ability to affect how voting power or investment power will be exercised." *SEC v. First City Fin. Corp.*, 688 F. Supp. 705, 721–22 (D.D.C. 1988) (quoting 3 A.A. Sommer, Jr., Securities Law Techniques § 70.07(2)(c) (1987)). Indeed, "Rule 13d–3 is crafted broadly enough to sweep within its purview informal, oral arrangements that confer upon a person voting or investment power." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1221 (D.C. Cir. 1989). The definition "does not turn on the formal legality of a beneficial owner's relationship to shareholders; what is relevant is his power to dispose of or direct the disposition of their stocks." *SEC v. Sierra Brokerage Servs.*, 712 F.3d 321, 330 (6th Cir. 2013). These pre-enforcement cases make clear that the beneficial ownership

analysis is a fact-specific inquiry that calls for consideration of more than just formal, documented arrangements.[4]

Miller nonetheless argues he received inadequate notice because the SEC's position in this case is a departure from its previous stance that beneficial ownership could be established only through objective indicia of ownership, which he defines as including:

> serving as an officer, director, or manager of an entity that owns the securities, holding warrants, proxies or written agreements giving the "beneficial owner" the power to vote or dispose of the shares, proof that the asserted "beneficial owner" actually voted the shares, the beneficial owner is named as either the trustee or beneficiary of a trust holding the shares, an express agreement giving the beneficial owner the right to pledge, sell or otherwise dispose of the shares.

ECF 61, at 5. Miller cites no authority for his position that the SEC previously considered *only* such indicia. For this reason, *FCC v. Fox Television Studios, Inc.* is materially different from this case and does not support Miller's argument. 567 U.S. 239 (2012). In *Fox Television Studios*, the Supreme Court found regulated entities were deprived of constitutionally sufficient notice because the agency "changed course" from its previous stance that on-air obscenities gave rise to penalties only when repeated to a new stance that fleeting expletives amounted to a punishable violation, a change that it pronounced in an Order finding violations of its rules. *Id.* at 253–58. Here, Miller offers nothing but his own representations that the SEC previously required objective indicia of ownership to establish beneficial ownership. Miller thus has failed to present evidence that the SEC "changed course" in this case so as to deprive him of constitutional notice. *See Global Green*

---

[4] Miller takes issue with a "totality of the circumstances" approach to proving beneficial ownership, which he describes as "clear as mud." ECF 50-1, at 10; ECF 61, at 3. The totality of the circumstances standard "instructs the factfinder to take into account all circumstances" rather than making any determination on the basis of "an isolated fact." *Buschco v. Shurtleff*, 729 F.3d 1294, 1308 (10th Cir. 2013). It is used commonly across the American legal system to answer a wide variety of fact-specific questions. Miller provides no authority suggesting the use of the totality of the circumstances standard may serve as a justification to hold a regulation unconstitutionally vague, and the wide use of the standard undermines that suggestion.

*v. SEC*, 631 F. App'x 868, 870 (11th Cir. 2015) (unpublished) (rejecting a fair notice challenge in part because "there is no suggestion that the Commission's interpretation or enforcement policy has shifted over time" and citing *Fox Television Studios*); *Suburban Air Freight, Inc. v. Transp. Sec. Admin.*, 716 F.3d 679, 684 (D.C. Cir. 2013) (rejecting a fair notice challenge in part because "Suburban ma[de] no argument that TSA previously interpreted . . . [the relevant] provisions differently" and citing *Fox Television Studios*). Moreover, the authorities cited by the SEC are consistent with the judicial constructions previously offered and reaffirmed here. The SEC made clear at least as early as 1977 that the "power" contemplated by Rule 13d–3 does not turn on "the legal right to vote securities . . . inasmuch as another person or persons may have the power whether legal, economic, or otherwise, to direct such voting." *In re Securities Exchange Act of 1934*, SEC Release No. 5808, at *5 (1977). Indeed, that Release specifically observes that "Rule 13d–3 points out that the rule cannot be circumvented by an arrangement to divest a person of beneficial ownership or to prevent the vesting of beneficial ownership as part of a plan or scheme to evade the reporting requirements of Section 13(d)." *Id.*[5]

The other two cases on which Miller relies also are dissimilar. In *Satellite Broadcasting Company v. FCC*, the court held that regulations provided constitutionally defective notice where they directed the regulated entity to file applications in two different locations. 824 F.2d 1, 1–4 (D.C. Cir. 1987). The company applied and was invited to operate microwave radio stations across

---

[5] Additionally, the regulation in *Fox Television Studios* implicated speech, which triggered "rigorous adherence" to due process requirements "to ensure that ambiguity [did] not chill protected speech." 567 U.S. at 253–54. Miller's challenge does not concern protected speech, and the heightened review employed in *Fox Television Studios* is not warranted here. *See Vill. of Hoffman Ests.*, 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or association, a more stringent vagueness test should apply.").

several regions. *Id.* at 1–2. The agency ultimately rescinded that invitation because the company filed its applications in Washington, D.C. and not Gettysburg, Pennsylvania. *Id.* at 2. The regulations in effect at that time required, in subpart F of Part 1, all radio station filings to be filed in Gettysburg. *Id.* But another regulation in subpart F of Part 1 required, by reference to 47 C.F.R. § 94.25(b) (1983), that all "applications" filed by radio stations to be submitted in Washington, D.C. *Id.* The scheme's regulatory conflict resolution provision provided, "In the case of any conflict or inconsistency between the rules set forth in subpart [F of Part 1, governing private radio services applications and proceedings] and the rules for the specific services enumerated in this section, the former shall govern." *Id.* But subpart F of Part 1 was the source of the conflict, and it gave two clearly different answers. The D.C. Circuit held the regulations violated the company's right to fair notice because both interpretations as to the filing location were reasonable. *Id.* at 3–4 ("The Commission through its regulatory power cannot, in effect, punish a member of the regulated class for reasonably interpreting Commission rules."). Put simply, the scheme in *Satellite Broadcasting Company* provided two conflicting but ostensibly correct answers to one question. It therefore was indeterminable which fact the regulated entity need have proven to show compliance with the agency's filing requirements. Here, in contrast, the regulation at issue provides a single standard by which to determine beneficial ownership. The question is whether Miller was able, through direct or indirect means, to control the disposition of Abakan stock.

In *General Electric Co. v. EPA*, the court likewise found a regulation failed to provide adequate notice for reasons not applicable to Miller's case. 53 F.3d 1324 (D.C. Cir. 1995). General Electric ("GE") challenged the agency's interpretation of regulations governing the disposal of a chemical solvent. *Id.* at 1326. GE distilled and recycled a portion of the solvent after each use through distillation, and the agency argued distillation and recycling were means of

"disposal" in violation of the regulation because the only approved means of disposal was incineration. *Id.* The court determined the relevant question was "whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations." *Id.* at 1329. It reasoned that, "if, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Id.* (citing *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976)). It concluded that GE was not "on notice" of the agency's interpretation because a person of good faith reviewing the applicable regulations reasonably could conclude that distillation was permitted, rather than clearly prohibited, and that the agency itself "struggled to provide a definitive reading of the regulatory requirements[.]" *Id.* at 1334. Here, conversely, Miller could have determined that Rule 13d–3 reached beyond "objective indicia of control" by consulting the plain language of the regulation and the cases and public agency statements that have interpreted it.

Finally, Miller previews his factual defenses to the charges. He claims that that he was acting only as a friend, translator, or advisor of the individuals responsible for the disposition of Abakan shares by the Uruguayan entities, that they could have chosen not to follow his advice, and that his conduct therefore does not fall within the scope of Rule 13d–3(a). The SEC counters with evidence that contradicts Miller's interpretation of the facts, including declarations of two people who have stated Miller himself initiated and negotiated the sale of the dispositions of the securities, as well as records that indicate the proceeds of those sales often flowed—sometimes directly—to Abakan. The SEC also offers evidence that Miller sent Lecueder emails with unsigned letters directing the disposition of securities held by Green Chip and Stratton that she

17

signed and relayed, verbatim. Ferris, whom Miller allegedly directed to purchase and resell Abakan shares sold by the Uruguayan entities owned by Lecueder, swears he never communicated with Lecueder. Taking this evidence in the light most favorable to the SEC, the Court concludes that a reasonable juror could find that Miller possessed the ability to direct others, including Lecueder and Ferris, to dispose of the securities and funnel the proceeds to his own ventures. Because there is a genuine dispute of material fact on, among other things, whether Miller possessed an undisclosed beneficial ownership in Abakan securities, summary judgment is denied.[6]

## IV.   Conclusion

Miller's motion for summary judgment is denied. He had adequate pre-enforcement notice of what conduct may constitute beneficial ownership, and there are genuine disputes of material fact as to whether he had the power to direct the disposition of Abakan shares through relationships, arrangements, or understandings with persons connected to the Uruguayan entities. A separate Order shall issue.

Date: November 1, 2022

_____
Deborah L. Boardman
United States District Judge

---

[6] In his summary judgment motion, Miller also airs his grievances with the SEC for frustrations he experienced during discovery. Specifically, he represents that the SEC provided him with a large investigative file that was difficult to review, which prevented him from understanding "the facts and evidence the SEC is relying on to establish 'beneficial ownership.'" ECF 50-1, at 7. Miller does not request the Court take any action to redress his grievances.