**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SECURITIES & EXCHANGE COMMISSION, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *     Civ. No. DLB-19-2810 |
| | * |
| ROBERT HILLIS MILLER, | * |
| | * |
| Defendant. | |

**MEMORANDUM OPINION**

In this civil enforcement action, the United States Securities and Exchange Commission ("SEC") alleged Robert Hillis Miller, Chief Executive Officer and founder of Abakan, Inc. ("Abakan"), a publicly traded company, violated federal securities laws when he hid from investors his "beneficial ownership" of Abakan stock that was registered to three Uruguayan entities whose owners had close personal relationships with Miller.

The SEC proved its allegations at trial. After an eight-day trial, a jury found Miller violated Securities Act Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) and (c); and 17(a), 15 U.S.C. § 77q(a); and Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; Section 13(d), 15 U.S.C. § 78m(d), and Rules 13d-1 and 13d-2 thereunder, 17 C.F.R. §§ 240.13d-1, 240.13d-2; and Section 16(a), 15 U.S.C. § 78p(a) and Rules 16a-2 and 16a-3 thereunder, 17 C.F.R. §§ 240.16a-2, 240.16a-3. It also found Miller violated Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14. Now, the SEC seeks a final judgment and remedies for the violations. For the following reasons, the Court permanently enjoins Miller from violating the securities laws, bars Miller from serving as an officer or director of a public company for ten years, and bars Miller from participating in penny-stock offerings for ten years. The Court also

orders Miller to pay a civil penalty of $160,000 and repatriate his assets to satisfy the judgment. The SEC's requests for disgorgement and pre-judgment interest are denied without prejudice.

## I.    Trial Evidence

Miller is the founder and former Chief Executive Officer ("CEO") of Abakan, a publicly traded company. Joint Ex. 1, Stipulations 2, 8, 9. Miller served in that role from December 2009 through October 2015. Joint Ex. 1, Stipulation 2. Through its subsidiary, MesoCoat, Inc., and its affiliate, Powdermet, Inc., Abakan developed products designed for metal-coating, including its proprietary coating materials and application process. Pl.'s Ex. 12, at 4–6.

Abakan was a penny-stock company that traded under the symbol "ABKI." Joint Ex. 1, Stipulation 9. A penny stock is a stock of a smaller company that trades under $5 per share. 17 C.F.R. § 240.3a51-1. Miller has worked with development stage companies like Abakan in the past, and many of these companies offered penny stocks. *See* ECF 173 at 66:11–67:9, ECF 175 at 22:4–16.

As a publicly traded company, Abakan was subject to a bevy of SEC filing requirements. Abakan was required to file an annual report on Form 10-K, which requires the company to include information about the beneficial owners of the company's stock. *See* 15 U.S.C. § 78m(a); 17 C.F.R. § 249.310. The company's CEO must certify that the information in the Form 10-K is true and correct. *See* 17 C.F.R. § 240.13a-14. The company files its Form 10-Ks in the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, and the reports then are publicly available online. ECF 173, at 78:20–23. Abakan also was required to file similar quarterly reports on Form 10-Q. *See* 15 U.S.C. § 78m(a); 17 C.F.R. § 249.308a.

Additionally, Section 13(d) of the Exchange Act requires any person who acquires beneficial ownership of more than five percent of certain registered securities to disclose

information about their holdings publicly by filing a Schedule 13D in EDGAR. 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d–1. A person is a "beneficial owner" of a security if that person directly or indirectly has, or shares, voting power or investment power for the security. 17 C.F.R. § 240.13d-3. The Exchange Act also requires officers and directors of public companies to publicly disclose transactions on Form 4s if the transactions involve the purchase or sale of their company's stock in which they have a pecuniary interest. 15 U.S.C. § 78p(a)(1); 17 C.F.R. § 240.16a-3(a).

The SEC presented evidence that Miller did not comply with these filing requirements because he failed to disclose his beneficial ownership of Abakan stock held by three Uruguayan entities: Stratton, S.A., Green Chip, S.A., and River Fish Holdings, Ltd (the "Uruguayan entities"). When Miller established Abakan, he had Abakan shares registered in the names of the Uruguayan entities. Joint Ex. 10-1, ¶ 7. The entities either received the Abakan shares for free or for very little money. *Id.* Miller's Uruguayan ex-wife, Maria Dolores Longo, and his longtime Uruguayan friend, Manon Lecueder, were officers in all three entities. Lecueder was a director of Stratton and Green Chip and a "signing director" for River Fish. Joint Ex. 2, at 2; Joint Ex. 4, at 18:13–18. A foundation created by Longo's mother owned River Fish. Joint Ex. 4, at 12:4–14:4. Longo testified that she was a director of Stratton and Green Chip. *Id.* at 17:25–18:18, 20:4–10. She also testified that she served as vice president of Green Chip's Board of Directors and Lecueder served as the Board's president, *id.* at 106:11–107:4, and that she and her mother directed the sale of River Fish's Abakan shares, *id.* at 15:13–16:5, 27:16–28:12, 106:16–107:1.

Not long after the company went public, Abakan began to struggle financially and neared insolvency. To raise capital and avoid insolvency, Miller directed the sale of millions of Abakan shares held by the Uruguayan entities. He did so via three sets of transactions: direct sales from

River Fish; loans from an investment firm, Yorkville Advisors ("Yorkville") to Green Chip; and sales of Abakan stock held by Stratton and Green Chip through his consultant, Steven Ferris.

First, from 2011 to 2013, Miller directed River Fish, through Longo, to sell more than $2 million of its Abakan stock in unregistered public offerings. ECF 174, at 40:21–23; Pl.'s Ex. 84. Once River Fish sold the stock, it sent most of the proceeds back to Abakan, MesoCoat, and other Miller-related entities. Pl.'s Ex. 84. Eventually, Longo's broker shut down her ability to sell Abakan shares because the broker was concerned that most of the proceeds from the stock sales were being sent to Abakan. Joint Ex. 10-1, ¶ 9.

Second, Miller facilitated a loan in 2013 between Green Chip and Yorkville. To secure the Yorkville loan, Miller and his associate, Philip Graves, falsely represented to Yorkville that Green Chip's Abakan shares were free trading and falsely told Yorkville that Green Chip was not an affiliate of Abakan. ECF 174, at 95:14–96:24, 99:6–100:24; Pl.'s Ex. 93; Pl.'s Ex. 94; Pl.'s Ex. 95; Pl.'s Ex. 96; Pl.'s Ex. 112, at 2; Pl.'s Ex. 119. Green Chip secured a $500,000 loan from Yorkville, using its Abakan shares as collateral. *See* Pl.'s Ex. 9. Green Chip then exercised two options from the loan for two additional $100,000 loans, and then obtained two additional $200,000 loans. *Id.* In total, Yorkville paid Green Chip (or MesoCoat or Abakan) a total of $1.1 million. *Id.* After Green Chip secured the loans from Yorkville, it distributed portions of the loan proceeds to Abakan. *Id.* Because Yorkville believed its Abakan shares were free trading, and thus exempt from the registration requirements applicable to restricted stock, it resold 1,213,316 Abakan shares to the public without complying with the registration requirements. Pl.'s Ex. 147; ECF 174, at 57:11–16. This unregistered public offering violated Section 5 of the Securities Act.

Finally, in the third transaction, Miller directed the sale of Abakan stock held by Stratton and Green Chip to Ferris, Miller's consultant. Ferris testified that Miller asked him to sell the

shares and "use the proceeds to pay a variety of bills for Abakan's operating expenses, including ceramics companies, plastic fabricators, employee wages, and utilities payments." Joint Ex. 10-1, ¶ 13. Even though Lecueder was the nominal owner of Green Chip, Ferris negotiated the sale of the Abakan shares only with Miller. *Id.* ¶ 12. Ferris testified that he never met or spoke with Lecueder. *Id.* During the transaction, Miller falsely represented to Ferris's broker that Stratton and Green Chip "ha[d] never been an affiliate nor a control entity of Abakan Inc." Pl.'s Ex. 154, 155. Ferris resold the Abakan shares without complying with the applicable registration requirements. At Miller's direction, Ferris used the proceeds of the sale to pay for Abakan's operating expenses. Joint Ex. 10-1, ¶ 13; Pl's Ex. 7; Pl.'s Ex. 8; Pl.'s Ex. 174; ECF 174, at 266:14–267:1.

Throughout these transactions, Miller reported in SEC filings that his ownership in Abakan's stock remained unchanged. Miller did not file Form 4s or Schedule 13D amendments to disclose the transactions or changes in ownership of the stock he beneficially owned through the Uruguayan entities. Pl.'s Ex. 18; Pl.'s Ex. 19; Pl.'s Ex. 20. He also did not include any information about his beneficial ownership of Abakan stock through the entities on any of the Form 10-Ks he filed in 2013, 2014, and 2015. Pl.'s Ex. 13; Pl.'s Ex. 14; Pl.'s Ex. 15.

Miller reinvested much, but not all, of the proceeds from these transactions into Abakan to cover Abakan's expenses and to pay himself. Abakan paid Miller and his corporate entity, Prosper Financial, a total of $517,737. Miller used Prosper Financial to pay his personal expenses. ECF 175 at 23:3–5, 24:8–12; *see also* Pl.'s Ex. 233, at 33, 35:3–7. From June 1, 2013 to February 16, 2015, Abakan made net payments to Miller of $308,975.92, and net payments to Prosper Financial of $208,761.56, for a total of $517,737. *See* ECF 174, at 18:6–22:17.

Miller kept records showing that he controlled the Abakan shares held by the Uruguayan entities and that he did not disclose the transactions to Abakan's shareholders. *See* Pl.'s Ex. 214. Miller insisted he did not control the Uruguayan entities' Abakan shares and that he had done nothing wrong. He testified, "I consider this case ridiculous, obscene." ECF 178, at 32:7. He also rejected out-of-hand the SEC's allegations, "I'm not accepting what [the SEC is] saying" *Id.* at 28:23. He called himself "vindictive . . . and that means I consider any charge whatsoever against me, one, I'll fight. And two, I consider it an offense, and next time I'll be better prepared." *Id.* at 32:13–16.

Miller's conduct had an impact on investors. Steven Zielske testified that, in reliance on Abakan's SEC disclosures, he invested in Abakan over the course of 2013 to 2016. *See* ECF 173, 2023, at 97:7–101:20, 103:2–108:22. Ultimately, Zielske lost approximately $72,000 that he invested in Abakan. *Id.* at 112:25–114:24. Bruce Weinstein, another investor, testified he lost the $20,000 that he invested in Abakan. ECF 173, at 146:24–147:1. As of May 2013, Abakan had $9.6 million in stockholder equity. Pl.'s Ex. 13, at 43. Much of that equity was wiped out when Abakan failed.

The SEC presented evidence that Miller believes he is judgment proof. At his deposition, Miller was asked if he considers himself judgment proof. He responded, "It depends on the judgment. In this case, yes." Joint Ex. 5, at 319:13–15. Miller acknowledged he has not paid any of a $3.8 million judgment from another matter and stated that "nothing ever will be paid." *Id.* at 306:11–18. That case concerned Miller's conversion of the plaintiff's property. Pl.'s Ex. 219. The SEC also alleges that Miller has refused to pay judgments in Miami Dade County, Florida,

though Miller claims that he has paid one of the judgments.[1] ECF 172-1, at 90–91, 93–95; ECF 181, at 9. Miller testified that he maintains his assets outside the United States and will continue to do so. ECF 178, at 31:12–17 ("And my assets are held by these offshore companies until I get out of this mess.").

At the conclusion of the trial, the jury returned a verdict for the SEC on all counts. ECF 161. The jury found Miller violated Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b-5 thereunder, Securities Act Sections 5(a) and (c), Exchange Act Rule 13a-14, Exchange Act Section 13(d) and Rules 13d-1 and 13d-2 thereunder, and Exchange Act Section 16(a) and Rules 16a-2 and 16a-3 thereunder. *Id.* And the jury found that Miller "knowingly or with severe recklessness" did not disclose his beneficial ownership of the Abakan shares held by Stratton, Green Chip, and River Fish when he committed fraud. *Id.* at 3.

The SEC now moves for the entry of final judgment and remedies for the securities law violations. The SEC seeks an order permanently barring Miller from violating securities laws, serving as an officer or director of a public company, and participating in penny-stock offerings, and the SEC seeks an order requiring Miller to disgorge his ill-gotten profits, repatriate foreign assets to satisfy the judgment, and pay civil penalties. ECF 172. Miller opposes the SEC's requested remedies. ECF 181. The SEC filed a reply. ECF 183. A hearing is not necessary. Loc. R. 105.6.

## II.   Discussion

"Where a violation of securities law has been found, a court is vested with broad discretion in deciding whether to grant injunctive relief." *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 424 (D. Md. 2005); *SEC v. Whittemore*, 659 F.3d 1, 9 (D.C. Cir. 2011) (remarking that

---

[1] In one of the Miami Dade County cases, the court held Miller in contempt for failing to abide by an order compelling discovery production. ECF 172-1, at 96–99.

district courts have "broad equitable power to fashion appropriate remedies for federal securities law violations") (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996)); *see also* 15 U.S.C. §§ 77t, 78u. "At the remedies stage, trial judges may make factual findings and rely on such findings in assessing the amount of civil penalties so long as the court's findings do not conflict with the jury's findings as to liability." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 781–82 (5th Cir. 2017); *accord SEC v. Murphy*, 50 F.4th 832, 848 (9th Cir. 2022).

### A.  Injunctive Relief

#### 1.  Bar from Serving as an Officer or Director

A court may bar a defendant from serving as an officer or director of a public company in the future if his "conduct demonstrates unfitness to serve as an officer or director." 15 U.S.C. § 78u(d)(2). To determine whether and for how long a bar is warranted, courts consider: "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *Lawbaugh*, 359 F. Supp. 2d at 426 (quoting *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)); *SEC v. Resnick*, 604 F. Supp. 2d 773, 783 (D. Md. 2009) (quoting *Lawbaugh*, 359 F. Supp. 2d at 426); *SEC v. Chapman*, 826 F. Supp. 2d 847, 858 (D. Md. 2011)

(same).[2] These factors, referred to as the *Patel* factors, are not the only factors that a court may consider, though they are instructive in guiding the court's "substantial discretion." *See Patel*, 61 F.3d at 141. Here, the factors weigh heavily in favor of imposing a bar.

Miller's conduct was egregious. The evidence at trial showed that Miller organized and perpetuated a complex, multi-year scheme to disguise his beneficial ownership of more than eleven percent of Abakan's stock. To do so, Miller secretly parked his stock in three offshore entities—Green Chip, River Fish, and Stratton. He then facilitated three high-value transactions: the unregistered public offerings of Abakan securities through River Fish, the Yorkville/Green Chip loan, and the unregistered public offerings of Abakan securities through Ferris. Miller lied to the SEC by repeatedly filing false or misleading statements and by failing to file additional reports he was required to file. He lied to Yorkville about his control over Green Chip's Abakan stock. And he deceived investors and the market by not complying with securities disclosure requirements. *See SEC v. Miller*, 744 F. Supp. 2d 1325, 1337 (N.D. Ga. 2010) ("[C]ourts have frequently found that defendants have acted egregiously when they have misled investors."). Miller's flagrant violations of securities laws misled and harmed Abakan investors. The first factor weighs in favor of a bar.

The second factor weighs in Miller's favor. Miller has not previously been found liable for securities law violations. The SEC argues that the Court nevertheless should treat Miller as a

---

[2] *Patel* interpreted an earlier version of the securities laws, which authorized a bar only "if the person's conduct demonstrates *substantial unfitness* to serve as an officer or director." *Patel*, 61 F.3d at 140–41 (emphasis added) (quoting 15 U.S.C. §§ 77t(e), 78u(d)(2) (1990)). While some courts have rejected *Patel* and applied a nine-factor test in light of the 2002 amendment, other courts, including the District of Maryland, have continued to apply the *Patel* six-factor test. *Compare SEC v. Levine*, 517 F. Supp. 2d 121, 145–46 (D.D.C. 2007), *with Lawbaugh*, 359 F. Supp. 2d at 426; *Resnick*, 604 F. Supp. 2d at 783; and *Chapman*, 826 F. Supp. 2d at 858; *see also SEC v. Bankosky*, 716 F.3d 45, 48 (2d Cir. 2013) (holding that district court properly applied *Patel* factors even after the amendment). The Court agrees that, even after the 2002 amendments, the *Patel* factors are appropriate to determine the length of the officer or director bar.

repeat offender. It points to evidence that Miller may have engaged in a similar scheme as a director for another company, Sonnen Corp. Miller does not address this evidence. The Court declines to rely on the SEC's circumstantial evidence and treats Miller as a first-time offender. *See SEC v. Honig*, No. 18 Civ. 8175, 2024 WL 3454840, at *11 & n.5 (S.D.N.Y. July 18, 2024) (considering only whether the defendant had been found liable for previous violations of securities law).

The third and fourth factors weigh in favor of a bar. Miller was the CEO of Abakan when he engaged in the fraud. Miller acted with a high degree of scienter; the jury specifically found that he "knowingly or with severe recklessness" misrepresented his beneficial ownership of the Abakan shares held by the offshore entities when he perpetuated the fraud. ECF 160, at 3. And contrary to Miller's protestations, his fraud was not simply "a filing mistake (that resulted from [a] genuine difference of opinion)" or "a transactional error." ECF 181, at 20, 22. Miller was the mastermind behind the three transactions and took steps to conceal his role in them. He personally attested to the accuracy of multiple Form 10-Ks and 10-Qs across several years, even though he knew that the forms did not contain accurate information about his beneficial ownership of the Abakan shares held by the Uruguayan entities. *See Resnick*, 604 F. Supp. 2d at 782 ("The fact that [the defendant's] fraud scheme involved repeated misrepresentations over a period of years also suggests a substantial degree of scienter.").

The fifth factor also weighs in favor of a bar. Miller was personally enriched by his control and sale of Abakan stock that he beneficially owned. As a result of the three transactions, Miller personally received $517,737 in salary and reimbursements. And he avoided the depreciation in value of the other 24,100,000 Abakan shares that he beneficially owned. His

large economic stake in the company gave him strong financial motivation to ensure Abakan's success.

The final factor—the likelihood that misconduct will recur—weighs in favor of a bar. The Court is very concerned that Miller will continue to violate securities law. Miller seems not to understand the significance of his actions. He claims that "filing mistakes are made all the time in North America, possibly hundreds of times a week." ECF 181, at 2. Miller's conduct cannot be chalked up to filing mistakes. Miller coordinated multiple unlawful securities sales. He affirmatively misrepresented in Abakan's SEC filings his beneficial ownership of the Abakan stock registered to the Uruguayan Entities. He secured loans from Yorkville on the false promise that Green Chip's Abakan shares were free trading and the false statement that Green Chip and Abakan were not affiliates. And as the jury found, he did so with scienter. Unfazed by the jury's verdict against him, Miller tries to relitigate the issues raised at trial and minimize his conduct.

Miller has expressed no remorse. He either does not appreciate the gravity of his fraud or refuses to admit it. Under either scenario, there is a strong likelihood of recurrence. *See Lawbaugh*, 359 F. Supp. 2d at 426 ("[B]ecause Defendant has not expressed remorse, the court finds a strong likelihood of recurrence."). Instead of recognizing the risk his actions posed to Abakan investors, Miller highlights Zielske's testimony that, if he had known Miller controlled more of Abakan's stock than Miller disclosed, it would not have impacted his decision to invest. ECF 181, at 12. But investors like Zielske would have wanted to know that Miller was coordinating the sale of stocks that he beneficially owned to raise capital for the company. Even as he minimizes his conduct, Miller says he "is happy to provide assurances against future violations" and "does so, with sincerity." *Id.* at 15. This assurance comes too late. Miller has denied culpability in this case for years. At trial, he expressed vindictiveness towards the SEC

and SEC attorneys in front of the jury. If Miller is allowed to serve as an officer or director again, the Court has every reason to believe he will abuse the trust of the position.

Almost every *Patel* factor weighs strongly in favor of a bar. The Court will impose one.

The question, then, is the duration of the bar. The SEC advocates for a lifetime bar for Miller. ECF 17, at 5. A lifetime bar is an "extraordinary remedy, usually reserved for those defendants who engaged in prior securities violations, and under circumstances suggesting the likelihood of future violations." *SEC v. Boey*, No. 07-cv-00039, 2013 WL 3805127, at *3 (D.N.H. July 22, 2013) (citing *SEC v. DiBella*, No. 3:04-cv-1342, 2008 WL 6965807, at *10–11 (D. Conn. Mar. 13, 2008), *aff'd*, 587 F.3d 553 (2d Cir. 2009)). "[B]efore imposing a permanent bar, the court should consider whether a conditional bar (*e.g.*, a bar limited to a particular industry) and/or a bar limited in time (*e.g.*, a bar of five years) might be sufficient, especially where there is no prior history of unfitness." *Patel*, 61 F.3d at 142.

Even though Miller's conduct was egregious and even though he has expressed no remorse, the Court finds that a lifetime bar on serving as an officer and director of a public company is too severe for Miller. Now in his early seventies, Miller has decades of experience in investment banking and leading development stage companies, and he has never been charged with or been found liable for a securities law violation. *See Honig*, 2024 WL 3454840, at *11–12 (imposing five-year bar in part because defendant was not a repeat offender). For first time-offenders, some courts have imposed two- or five-year bars. *Cf. id.* (imposing five-year bar on defendant whose "violations amounted to hundreds of thousands of dollars in unregistered sales that were shielded from reporting and restrictions" but who acknowledged the seriousness of his offense); *SEC v. Selden*, 632 F. Supp. 2d 91, 99–100 (D. Mass. 2009) (imposing two-year bar when defendant had only "minimal" economic stake in the fraud but refused to accept

responsibility for his conduct); *SEC v. Johnston*, 368 F. Supp. 3d 247, 252–53 (D. Mass. 2019) (imposing a two-year bar where first-time offender took part in scheme involving fraudulent misrepresentations but had minimal economic stake in scheme); *SEC v. Dunn*, No. 2:09-cv-2213, 2012 WL 3096646, at *4–5 (D. Nev. July 30, 2012) (finding five-year bar sufficient for defendant who participated in single instance of insider trading and who had minimal economic stake in the violations).

Here, the Court finds that a ten-year bar "should be sufficient to deter any future misconduct and to impress upon [Miller] the gravity of his violations." *Johnston*, 368 F. Supp. 3d at 253. A ten-year bar reflects the severity of Miller's conduct and his lack of remorse. *See Miller*, 744 F. Supp. 2d at 1348 (finding fifteen-year bar appropriate for CEO defendant who had a prior securities infraction, concocted and carried out a "complex and egregious" fraud scheme with a high degree of scienter, ignored the substantial loss to investors and significant risk of loss to investors, "ha[d] shown no contrition," and was "vehement in his denial of any wrongdoing").

Miller is barred from serving as an officer and director of a public company for ten years.

### 2.     Bar from Participating in Penny Stocks

The SEC also seeks to permanently bar Miller from participating in penny-stock offerings. *See* 15 U.S.C. §§ 77t(g)(1), 78u(d)(6)(A). The SEC admits that it did not request this relief in its complaint. ECF 172, at 20. Even so, the Federal Rules of Civil Procedure state that "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). "The relief to which a claimant is entitled is not limited to the relief it requested in its original demand for judgment," provided the issue was squarely presented and litigated at trial. *JTH Tax, Inc. v. Aime*, 984 F.3d 284, 290–91 (4th Cir. 2021) (quoting *Gilbane Bldg. Co. v. Fed. Reserve Bank*, 80 F.3d 895, 901 (4th Cir.

1996)). Here, the issues relevant to Miller's fitness to participate in penny-stock offerings were raised in the complaint and fully and fairly litigated at trial. This relief is available.

A court may enjoin any person who, "at the time of the alleged misconduct, [ ] was participating in [ ] an offering of penny stock, . . . from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine." 15 U.S.C. §§ 77t(g)(1), 78u(d)(6)(A). Before considering the merits of such a request, "the SEC must demonstrate that the stock at issue in the violations under review [was], in fact, a penny stock" as defined by relevant statutes and rules. *SEC v. Huff*, 758 F. Supp. 2d 1288, 1357 (S.D. Fla. 2010). Once the definition is satisfied, the question is whether to bar the individual. Here, the parties stipulated that Abakan was a penny stock. Joint Ex. 1, Stipulations 9, 10, 11.

District courts generally apply the same factors for officer-or-director bars to penny-stock bars. *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007) ("The standard for imposing [a penny-stock] bar essentially mirrors that for imposing an officer-or-director bar."); *SEC v. E-Smart Techs., Inc.*, 139 F. Supp. 3d 170, 182 (D.D.C. 2015) (collecting cases).

For the same reasons the Court imposed a ten-year bar on serving as an officer or director of a public company, the Court imposes a ten-year bar on participating in penny-stock offerings.

### 3.      **Permanent Injunction from Violations of Securities Laws**

When a defendant has violated the securities laws, a district court may enjoin that defendant from further securities violations "upon a proper showing." 15 U.S.C. §§ 77t(b), 78u(d)(1). The decision whether to grant such injunctive relief is soundly within the court's broad discretion. *Lawbaugh*, 359 F. Supp. 2d at 424. The key question is whether "there is a reasonable likelihood that the wrong will be repeated." *Id.* (quoting *SEC v. Manor Nursing Ctrs.*,

*Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972)).  Factors that district courts consider in answering this question include: "(1) the seriousness of the original violation; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved on the part of the defendant; (4) the defendant's recognition of his unlawful conduct and the sincerity of his assurances against future violations; and (5) the likelihood that the defendant's occupation will present opportunities for future violations." *Resnick*, 604 F. Supp. 2d at 781 (quoting *SEC v. Marker*, 427 F. Supp. 2d 583, 590 (M.D.N.C. 2006)).

Several factors weigh in favor of enjoining Miller from violating the securities laws. Miller orchestrated a scheme to defraud investors. Miller knowingly or with reckless disregard for the truth did not disclose the Abakan stock sales and his beneficial ownership of Abakan stock. Miller directed others to help him carryout the scheme. His unlawful conduct spanned several years. Investors relied on the false representations in the Form 10-K filings. Most importantly, Miller still does not publicly acknowledge his fraudulent conduct. To this day, Miller maintains that this action arises out of a "difference of opinion" and that his violations were "inadvertent." ECF 181, at 2, 6. Although Miller insists that these violations "will not recur," ECF 181, at 13, Miller has given the Court and the public no reason to trust that assurance. The Court permanently enjoins Miller from violating securities laws in the future.[3]

---

[3] The Court enjoins Miller from violating these laws: Sections 10(b), 13(d), and 16(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m(d), 78p(a), and Rules 10b-5, 13d-1, 13d-2, 13a-14, 16a-2, and 16a-3 thereunder, 17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13d-1, 240.13d-2, 240.16a-2, 240.16a-3, and Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and (c), 77q(a).

**B.  Monetary Remedies**

1.      **Disgorgement**

Under 15 U.S.C. §§ 78u(d)(5) and 78u(d)(7), a court may order a defendant to disgorge funds he obtained through violations of securities laws. *Liu v. SEC*, 591 U.S. 71, 74–75 (2020); *see also Resnick*, 604 F. Supp. 2d at 782; *Lawbaugh*, 359 F. Supp. 2d at 425; *SEC v. Giordano*, No. RDB-14-3598, 2017 WL 79938, at *1 (D. Md. Jan. 6, 2017) (quoting *Resnick*, 604 F. Supp. 2d at 7). "Where a party violates the federal securities laws, th[e] [c]ourt has broad discretion not only to order the disgorgement of any ill-gotten gains, but also to determine the amount to be disgorged." *SEC v. Laura*, No. 18-CV-05075 (HG) (VMS), 2024 WL 3360380, at *2 (E.D.N.Y. July 9, 2024) (quoting *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 562–63 (S.D.N.Y. 2009)); *see Giordano*, 2017 WL 79938, at *1 (quoting *Resnick*, 604 F. Supp. 2d at 782). Disgorgement is limited "to that which may be appropriate or necessary for the benefit of investors." *Liu*, 591 U.S. at 87 (quoting 15 U.S.C. § 78u(d)(5)).

The SEC seeks disgorgement of $517,737—$308,975.92 paid to Miller and $208,761.56 paid to Prosper Financial.[4] Miller does not contest that Abakan paid $517,737 to him and Prosper Financial. Still, Miller argues disgorgement is improper. First, he states these funds are not subject to disgorgement because the transactions themselves were "legitimate and not improper." ECF 181, at 16. In Miller's telling, his violation is a minor record-keeping error—a mere failure to mention he was selling stock. What Miller ignores, however, is that the jury

---

[4] Although Miller disputes that Prosper Financial was his alter ego, the record reflects that Miller used the company as a shield for his own legal liabilities and a pass-through entity for his own expenses. Miller admitted that the payments to Prosper Financial were his salary and that Prosper Financial paid his personal bills. *E.g.*, ECF 175, at 23:3–5, 24:8–12. "Where, as here, the evidence shows a common owner who fails to observe corporate formalities and often commingles funds to avoid legal obligations, it is not error to treat the entities as one." *Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 588 (4th Cir. 2015). The Court therefore will treat Prosper Financial as Miller's alter ego.

found he committed securities fraud. As part of that fraudulent scheme, Miller directed the Uruguayan Entities to sell Abakan stock and then funneled some of the proceeds of the sale to himself and Prosper Financial. The transactions were not legitimate; they were unlawful. Disgorgement of funds that Miller received as a result of the unlawful transactions is appropriate.

Miller's second argument fares better. He argues the money Abakan transferred to him and Prosper Financial was used to pay legitimate business expenses and may not be disgorged. Miller is correct that the Court cannot require him to disgorge his legitimate business expenses. And the SEC admits that the requested disgorgement amount, $517,737, includes business expenses. ECF 183, at 6. Given that admission, the SEC has not submitted a reasonable approximation of profits, and the Court cannot order disgorgement on this record.

*Liu* compels this conclusion. In *Liu*, the petitioners were a married couple who organized a scheme to obtain millions of dollars through the EB-5 Immigrant Investor Program. 591 U.S. at 77. The SEC brought a civil action against the petitioners. *Id.* at 78. The district court granted judgment to the SEC and ordered disgorgement equal to the full amount the petitioners raised from the investors, less the money that remained in the project's corporate accounts. *Id.*

The petitioners argued that the disgorgement award was improper because it failed to account for their business expenses. *Id.* The Supreme Court found that disgorgement remained a valid equitable remedy, but it agreed with the petitioners and held that "courts must deduct legitimate expenses before ordering disgorgement under [the Securities Exchange Act]." *Id.* at 91–92. Because the district court did not do so, the Court vacated and remanded. *Id.* at 92.

Under *Liu*, disgorgement is a "profits-based remedy." *Id.* Of course, calculating the profits a defendant has received can be challenging, and courts have recognized that "separating legal from illegal profits exactly may at times be a near-impossible task." *SEC v. Razmilovic*, 738

F.3d 14, 31 (2d Cir. 2013) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989)). For that reason, "the amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation, and any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Laura*, 2024 WL 3360380, at *2 (quoting *SEC v. de Maison*, No. 18-2564, 2021 WL 5936385, at *2 (2d Cir. Dec. 16, 2021)); *see also SEC v. Owings Grp., LLC*, No. RDB-18-2046, 2021 WL 1909606, at *3 (D. Md. May 12, 2021), *aff'd sub nom. SEC v. Johnson*, 43 F.4th 382 (4th Cir. 2022). The burden of establishing that "reasonable approximation of the profits" initially rests with the SEC. *Razmilovic*, 738 F.3d at 31; *see also SEC v. Lemelson*, 596 F. Supp. 3d 227, 238 (D. Mass. 2022).

Once the SEC has put forth a "reasonable approximation of profits," the defendant bears the burden of showing he made additional legitimate business expenses. *See CFTC v. Tayeh*, 848 F. App'x 827, 830 (11th Cir. 2021); *see also SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (recognizing that the defendant bears the burden "to identify any additional 'legitimate' business expenses that, consistent with *Liu*, should have been deducted from an otherwise reasonable disgorgement amount"); *First City.*, 890 F.2d at 1232 (applying burden-shifting framework); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (same). The defendant must provide "concrete and credible evidence" to demonstrate the value of his business expenses and that those expenses furthered a legitimate business purpose. *Tayeh*, 848 F. App'x at 830.

The SEC's calculation fails at the first step of the analysis. The SEC admits that $517,737 includes both Miller's "salary and reimbursement for previously claimed expenses." ECF 183, at 6. At a pretrial conference on May 5, 2023, the SEC stated it that it "[did not] dispute that some

of the money that went to Mr. Miller was reimbursement for business expenses." ECF 124, at 85:1–2. And at trial, an SEC accountant, Andrea Fox, testified that some of the payments in the $517,737 calculation "could have been reimbursement for business expenses." ECF 174, at 20:8–11.

Given that the SEC concedes that its proposed disgorgement amount includes both profits and business expenses, a disgorgement order for the entire amount the SEC seeks would run afoul of *Liu* and "test the bounds of equity practice." *Johnson*, 43 F.4th at 393 (quoting *Liu*, 591 U.S. at 85). Even though the defendant bears the burden of establishing deductions for legitimate business expenses, the defendant bears that burden only after the SEC has established its "reasonable approximation of profits." *Fowler*, 6 F.4th at 267. The SEC's accountant acknowledged that the SEC's calculation included Abakan's business expenses. The SEC has not shown that it attempted to determine Miller's net profits from the scheme. *Cf. SEC v. Kon*, No. 1:21-cv-24320, 2023 WL 195203, at *2 (S.D. Fla. Jan. 17, 2023) (noting that the SEC "review[ed] limited records with [the defendant] under oath" to determine which legitimate business expenses it should deduct from its profits calculation); *Laura*, 2024 WL 3360380, at *3 (noting that the SEC netted out any expenses that it determined to be legitimate business expenses based on information it received from the defendants).

The SEC claims that reimbursements to Miller are not deductible expenses because Abakan would have run out of money were it not for the fraud and thus any business expenses were funded entirely by the fraud. The SEC argues that, under these circumstances, it would be inequitable for Miller to receive reimbursements for Abakan's business expenses at the expense of reimbursing investors.

That misreads *Liu*. In *Liu*, the Supreme Court specifically instructed the district court to consider whether it would be "consistent with the equitable principles underlying § 78u(d)(5)" to include payments on a lease and for cancer-treatment equipment in a disgorgement order. 591 U.S. at 92. Those expenses could be deducted even though the petitioners may have used ill-gotten gains to pay for them. *Id. Liu* emphasized that "courts [have] consistently restricted awards to net profits from wrongdoing *after* deducting legitimate expenses." *Id.* at 84 (emphasis added).

True, *Liu* recognized that a court need not deduct business expenses "when the 'entire profit of a business or undertaking' results from the wrongful activity." *Id.* (quoting *Root v. Lake Shore & M.S. Ry. Co.*, 105 U.S. 189, 203 (1881)). But that circumstance is not here. The SEC has never argued that all of Abakan's profits results from wrongful activity. In fact, it was undisputed that Abakan invested in MesoCoat, a legitimate business that developed and produced metal-coating products. Some of the expenses included in the disgorgement may be legitimate. *Liu* precludes the recoupment of *illegitimate* expenses, such as "materials . . . bought for the purposes of the infringement" and "'extraordinary salaries' [that] appear[] merely to be 'dividends of profit under another name.'" *Id.* (quoting *Rubber Co. v. Goodyear*, 9 Wall. 788, 803 (1870)). Applying *Liu*, courts have disallowed deductions for funds spent to sustain the underlying fraud. *See, e.g., Owings*, 2021 WL 1909606, at *4 (refusing to deduct business expenses from disgorgement amount "because they were used to solicit investors into the fraudulent scheme"). The Court does not have enough information to determine whether the business expenses included in the SEC's disgorgement figure are legitimate or illegitimate.

The Court also does not have enough information to determine whether Miller's salary should be disgorged. Miller admits that $150,000 of the money Abakan sent to Prosper Financial

funded his salary. A defendant's salary may be included in disgorgement. *See Johnston*, 368 F. Supp. 3d at 254 ("[C]ourts commonly order defendants to disgorge not only the proceeds of a fraud but also salary and bonuses earned during the period of a fraud and amounts equivalent to losses avoided as a result of the securities violation."); *SEC v. Church Extension of Church of God, Inc.*, 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005) (ordering disgorgement of one-half of officer's salary where, "[b]ut for the securities violations, [the organization] would have collapsed earlier, so the violations enabled the defendants to continue their employment" and receive salary payments). *But see Chapman*, 826 F. Supp. 2d at 859 (denying SEC's request for disgorgement of salary where "[t]he SEC has not shown a causal relationship between [defendant's] salary and bonuses and the fraud"); *Resnick*, 604 F. Supp. 2d at 783 (same). Neither party has adequately addressed whether there was a causal relationship between Miller's salary and the fraud. The Court does not have sufficient information to determine whether Miller's salary should be disgorged.

The Court denies the SEC's request for disgorgement without prejudice. By November 14, 2024, the SEC may renew its request. The SEC should provide a reasonable approximation of Miller's profits or explain why $517,737 is a reasonable approximation. If the SEC has reasonably approximated Miller's profit, Miller bears the burden of proving other legitimate business expenses should be deducted. He must do so with concrete and credible evidence. If the SEC renews its request for disgorgement, Miller's response is due December 13, 2024, and the SEC may file a reply by December 20, 2024.

The Court also denies without prejudice the SEC's request for prejudgment interest on the disgorgement amount. If the SEC renews its request for disgorgement, it may also renew its request for prejudgment interest at the same time.

2.      **Civil Penalty**

The Court next addresses the SEC's request for a civil monetary penalty. Civil monetary penalties "are intended to punish, and label defendants wrongdoers." *Gabelli v. SEC*, 568 U.S. 442, 452 (2013). Civil penalties serve a different purpose than disgorgement. "A civil penalty [may be] necessary because disgorgement merely requires the return of illegal profits; it does not impose an actual economic penalty as a deterrent to violations of the securities law." *Marker*, 427 F. Supp. 2d at 592.

The securities acts provide for three tiers of civil penalties. They increase based on the seriousness of the violation. Tier one may be levied for any violation. *See* 15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). Tier two may be imposed for a violation involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii). And tier three may be imposed for tier two violations that also "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii). The SEC seeks a third-tier civil penalty. These penalties may be calculated in either of two ways: (1) a court may impose a fixed amount multiplied by the number of violations or the number of persons defrauded or (2) a court may impose a penalty equal to a defendant's gross pecuniary gain. *Owings*, 2021 WL 1909606, at *6; *see also SEC v. N. Star Fin., LLC*, No. GJH-15-1339, 2019 WL 3860321, at *10 (D. Md. Aug. 15, 2019)).

Courts weigh several factors in determining whether to assess a penalty and in what amount. One factor is "whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *Johnson*, 43 F.4th at 394 (quoting *SEC v. Rajaratnam*, 918 F.3d 36, 44 (2d Cir. 2019)). The others are: "(1) the egregiousness of the

defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; [and] (4) whether the defendant's conduct was isolated or recurrent." *Id.* These factors, however, are neither "exhaustive" nor should they "be taken as talismanic." *Id.*

The Court finds that a civil penalty is necessary. Miller engaged in a years-long scheme to defraud the market. He misrepresented his beneficial ownership of Abakan share and Abakan's financial viability for his personal benefit. The scheme involved intentional acts of deception and caused a risk of substantial loss to investors. A civil penalty will deter Miller from future misconduct.

Miller's conduct meets the criteria for a third-tier violation, and a civil penalty at that level is appropriate. The jury found Miller intentionally defrauded the public. His fraudulent scheme caused actual losses and the risk of substantial losses. *See SEC v. Aragon Cap. Mgmt., LLC*, 672 F. Supp. 2d 421, 452 (S.D.N.Y. 2009) (concluding *potential* losses of $120,000 warranted third tier penalty), *aff'd in part, vacated in part sub nom. SEC v. Rosenthal*, 650 F.3d 156 (2d Cir. 2011), *and aff'd in part sub nom. SEC v. Rosenthal*, 426 F. App'x 1 (2d Cir. 2011). Miller's actions created the false impression that the value of Abakan's stock was stable. Weinstein and Zielske testified that they invested in Abakan in part because they believed, based on Abakan's Forms 10-K, that Miller was not selling the shares of Abakan stock he beneficially owned. Had Miller's fraud come to light, the value of Abakan's stock could have plummeted and caused substantial losses to Abakan's investors. Miller's misrepresentations in his SEC filings created a risk of substantial losses to investors. *See SEC v. Findley*, No. 3:20-CV-0397 (SRU), 2024 WL 707264, at *10 (D. Conn. Feb. 21, 2024) (finding that third-tier penalty was appropriate when defendants "made false statements in order to artificially prop up [company's]

stock price and to attract investors," thereby creating significant risk that false statements "would result in substantial losses to investors"); *SEC v. SeeThruEquity, LLC*, No. 18 Civ. 10374, 2022 WL 171196, at *2 (S.D.N.Y. Jan. 19, 2022) ("Disseminating such materially false information into the market created a significant risk of substantial loss to the investing public."). The Court will impose a third-tier civil penalty.

The next question is the amount of the civil penalty. For third-tier penalties, the Court may order Miller to pay up to $160,000 per violation, if the Court imposes a penalty on a per-violation basis. *See* Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission, *available at* https://www.sec.gov/enforce/civil-penalties-inflation-adjustments (last visited Sept. 30, 2024). The SEC asks for three third-tier violations of $160,000, for a total of $480,000 in civil penalties. The SEC seeks one penalty for each of the fraudulent transactions: the River Fish stock sale, the Yorkville/Green Chip loan, and the Ferris stock sale. In the alternative, the SEC seeks three penalties for Abakan's 2013, 2014, and 2015 Forms 10-K, each of which contained false or misleading information. Other courts have adopted the SEC's recommended approach. *See SEC v. Sharp*, No. 21-11276, 2024 WL 3030345, at *12 (D. Mass. June 17, 2024); *Honig*, 2024 WL 3454840, at *13.

Even though the SEC's request is not unreasonable, the Court declines to impose a $160,000 penalty for each of the three violations. For ten years, Miller will be barred from serving as an officer and director of a public company and from participating in penny-stock offerings. He will be enjoined permanently from committing violations of securities law. These injunctions likely will reduce Miller's ability to earn money in the future. The Court will not penalize Miller $160,000 for each of the three violations. *See SEC v. Perkins*, No. 5:19-cv-243, 2023 WL 5418712, at *7 (E.D.N.C. Aug. 22, 2023) (declining to multiply civil penalty by

number of false statements made because of officer and director bar and permanent injunction against securities violations). The Court finds that a $160,000 penalty is appropriate in this case.

### C.  Repatriation of Foreign Assets

Courts have the inherent authority to ensure their judgments may be satisfied. *See, e.g.*, *Pfizer, Inc. v. Uprichard*, 422 F.3d 124, 131 (3d Cir. 2005). "'[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances.' Such relief includes an asset freeze, a repatriation order, and an impoundment of assets." *SEC v. Calabrigo*, No. 22-CV-3096 (LJL), 2022 WL 2704103, at *3 (S.D.N.Y. July 11, 2022) (quoting *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011)). A court may enter a repatriation order if there is reason to believe assets held outside the United States "could be subject to an eventual disgorgement." *SEC v. Illarramendi*, No. 3:11CV78 JBA, 2011 WL 2457734, at *7 (D. Conn. June 16, 2011).

A repatriation order is necessary in this case. Miller made it abundantly clear in sworn testimony that he has no intention of paying any judgment against him. He told the jury that all his assets are—and will continue to be—held outside the United States. ECF 178, at 31:14-17 ("[M]y assets are held by these offshore companies until I get out of this mess."). Miller's testimony invites a repatriation order. Miller will not repatriate his offshore assets unless the Court orders him to do so.

Miller is ordered to repatriate assets to satisfy the judgment against him in this case. If he does not repatriate them, that will be grounds for the government to seek to hold Miller in contempt. *See SEC v. Dunlap*, 253 F.3d 768, 775–76 (4th Cir. 2001) (affirming district court's incarceration of defendant for failure to comply with preliminary injunction requiring repatriation of foreign assets).

### D.  Fair Fund

The securities laws authorize the SEC to use civil penalties and disgorged funds to compensate injured investors. The SEC may do so through a special fund, called a "fair fund." *See* 15 U.S.C. § 7246. The SEC asks to preserve its ability to move the Court to establish a fair fund in the future. Because the Court orders Miller to pay a civil penalty and may order Miller to pay disgorgement in the future, the SEC may move to establish a fair fund after the disgorgement issue is decided. At that time, the SEC must "provide a distribution plan that proposes a fair and reasonable allocation of recovered funds to investors." *E-Smart Techs.*, 139 F. Supp. 3d at 193.

## IV.  Conclusion

For the foregoing reasons, the SEC's motion for a final judgment and remedies as to defendant Robert Hillis Miller is granted in substantial part. Miller is permanently enjoined from further securities violations. Miller is enjoined from serving as an officer or director of a public company and from participating in penny-stock offerings for ten years. The Court imposes a civil penalty of $160,000. Miller must repatriate his assets to satisfy the judgment. The Court denies the SEC's request for disgorgement and prejudgment interest without prejudice. The SEC may renew its request for disgorgement and prejudgment interest by November 14, 2024.

Date: September 30, 2024

Deborah L. Boardman
United States District Judge

26