## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SECURITIES & EXCHANGE      *
COMMISSION,

     *

        **Plaintiff,**

     *

**v.**                        **Civ. No. DLB-19-2810**

     *

**ROBERT HILLIS MILLER,**

     *

        **Defendant.**

### MEMORANDUM OPINION

In this civil enforcement action, the Securities and Exchange Commission ("SEC") obtained a jury verdict against Robert Hillis Miller, Chief Executive Officer ("CEO") and founder of Abakan, Inc. ("Abakan"), a publicly traded penny-stock company. The jury found that Miller violated federal securities laws when he failed to disclose to Abakan investors his beneficial ownership of Abakan stock that was registered to three Uruguayan entities whose owners had close personal relationships with Miller. The Court granted the SEC's motion for a final judgment in substantial part but denied without prejudice the SEC's request for disgorgement and prejudgment interest. Pending before the Court is the SEC's renewed motion for disgorgement of Miller's profits from the fraud. For the reasons below, the Court grants the motion in part and orders disgorgement in the amount of $472,484 with prejudgment interest.

### I.    Background

Miller is the founder of Abakan and served as its CEO from December 2009 through October 2015. Jt. Ex. 1, Stip. 2, 8, 9. Through its subsidiary, MesoCoat, Inc., and its affiliate, Powdermet, Inc., Abakan developed products designed for metal coating, including its proprietary coating materials and application process. Pl.'s Ex. 12, at 4–6.

Abakan was a penny-stock company that traded under the symbol "ABKI." Jt. Ex. 1, Stip. 9.[1] As a publicly traded company, Abakan was subject to a bevy of SEC filing requirements under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78qq, and related regulations. Abakan was required to file an annual report on Form 10-K, which requires the company to include information about the beneficial owners of the company's stock. *See* 15 U.S.C. § 78m(a); 17 C.F.R. § 249.310. On Form 10-K, the company's CEO must certify that the information provided is true and correct. *See* 17 C.F.R. § 240.13a-14. Companies file Form 10-Ks in the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system, which makes the reports publicly available online. ECF 173, at 78:20–23. Abakan also was required to file similar quarterly reports on Form 10-Q. *See* 15 U.S.C. § 78m(a); 17 C.F.R. § 249.308a.

The Exchange Act imposes additional requirements. Any person who acquires beneficial ownership of more than five percent of certain registered securities must disclose information about their holdings publicly by filing a Schedule 13D in EDGAR. 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d–1. A person is a "beneficial owner" of a security if that person directly or indirectly has, or shares, voting power or investment power for the security. 17 C.F.R. § 240.13d-3. Officers and directors of public companies must publicly disclose transactions on Form 4s if the transactions involve the purchase or sale of their company's stock in which they have a pecuniary interest. 15 U.S.C. § 78p(a)(1); 17 C.F.R. § 240.16a-3(a).

On September 24, 2019, the SEC filed a complaint against Miller, alleging that he violated provisions of the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa; and the Securities Exchange Act

---

[1] A penny stock is a stock of a smaller company that trades under $5 per share. 17 C.F.R. § 240.3a51-1. Miller has worked with development stage companies like Abakan in the past, and many of these companies offered penny stocks. *See* ECF 173 at 66:11–67:9, ECF 175 at 22:4–16.

of 1934 and several rules thereunder. *See id.* ¶¶ 107–32. The case proceeded to trial on June 7, 2023.

At trial, the SEC presented evidence that Miller did not comply with the SEC's filing requirements because he failed to disclose in Abakan's SEC filings his beneficial ownership of Abakan stock held by three Uruguayan entities: Stratton, S.A., Green Chip, S.A., and River Fish Holdings, Ltd. (the "Uruguayan entities"). When Miller established Abakan, he had Abakan shares registered in the names of the Uruguayan entities, which either received the Abakan shares for free or for very little money. Jt. Ex. 10-1, ¶ 7. Miller's Uruguayan ex-wife, Maria Dolores Longo, and his longtime Uruguayan friend, Manon Lecueder, were officers in all three entities. A foundation created by Longo's mother owned River Fish. Jt. Ex. 4, at 12:4–14:4. Longo testified that she and her mother directed the sale of River Fish's Abakan shares, *id.* at 15:13–16:5, 27:16–28:12, 106:16–107:1. Longo also testified that she was a director of Stratton and Green Chip, *id.* at 17:25–18:18, 20:4–10, and that she served as vice president of Green Chip's Board of Directors and Lecueder served as the Board's president, *id.* at 106:11–107:4. Lecueder was a director of Stratton and Green Chip and a "signing director" for River Fish. Jt. Ex. 2, at 2; Jt. Ex. 4, at 18:13–18.

Soon after Abakan went public, the company began to struggle financially and neared insolvency. To remedy these issues, Miller directed the sale of millions of Abakan shares held by the Uruguayan entities. He did so via three sets of transactions.

First, from 2011 to 2013, Miller directed River Fish, through Longo, to sell more than $2 million of its Abakan stock in unregistered public offerings. ECF 174, at 40:21–23; Pl.'s Ex. 84. Once River Fish sold the stock, it sent most of the proceeds back to Abakan, MesoCoat, and other Miller-related entities. Pl.'s Ex. 84. Eventually, Longo's broker shut down her ability to sell

Abakan shares because the broker was concerned that most of the proceeds from the stock sales were being sent to Abakan. Jt. Ex. 10-1, ¶ 9.

Second, in 2013, Miller facilitated a loan from an investment firm, Yorkville Advisors ("Yorkville"), to Green Chip. To secure the $500,000 Yorkville loan, Green Chip used its Abakan shares as collateral. Miller and his business associate falsely represented to Yorkville that Green Chip's Abakan shares were free-trading and that Green Chip was not an affiliate of Abakan. ECF 174, at 95:14–96:24, 99:6–100:24; Pl.'s Exs. 9, 93–96, 112, 119. Green Chip then exercised two options from the loan for two additional $100,000 loans (one to Green Chip and one to MesoCoat) and obtained two additional $200,000 loans (one to Green Chip and one to MesoCoat). Pl.'s Ex. 9. In sum, Yorkville lent Green Chip $800,000 and MesoCoat $300,000 for a total of $1.1 million. ECF 174, at 55:20–23, 56:7–8. Green Chip distributed $500,000 of the loan proceeds to Abakan. *Id.* at 56:13–14. Because Yorkville believed its Abakan shares were free-trading and thus were exempt from the registration requirements applicable to restricted stock, it resold 1,213,316 Abakan shares to the public without complying with the registration requirements. Pl.'s Ex. 147; ECF 174, at 57:11–16.

Finally, in the third transaction, Miller directed the sale of Abakan stock held by Stratton and Green Chip through Steven Ferris, Miller's consultant. Miller asked Ferris to sell the shares and "use the proceeds to pay a variety of bills for Abakan's operating expenses, including ceramics companies, plastic fabricators, employee wages, and utilities payments." Jt. Ex. 10-1, ¶ 13. Even though Lecueder was the nominal owner of Green Chip, Ferris negotiated the sale of Green Chip's Abakan shares only with Miller and never met or spoke with Lecueder. *Id.* ¶ 12. During the transaction, Miller represented to Ferris's broker that Stratton and Green Chip "ha[d] never been an affiliate nor a control entity of Abakan Inc." Pl.'s Exs. 154, 155. Ferris resold the Abakan shares,

and at Miller's direction, Ferris used the proceeds of the sale to pay for Abakan's operating expenses. Jt. Ex. 10-1, ¶ 13; Pl's Exs. 7, 8, 174; ECF 174, at 266:14–267:1.

Throughout these transactions, Miller reported in SEC filings that his ownership in Abakan's stock remained unchanged. Miller did not file Form 4s or Schedule 13D amendments to disclose the transactions or changes in ownership of the Abakan stock that he beneficially owned through the Uruguayan entities. Pl.'s Exs. 18–20. He also did not include any information about his beneficial ownership of Abakan stock through the Uruguayan entities on any of the Form 10-Ks he filed in 2013, 2014, or 2015. Pl.'s Exs. 13–15.

Miller used much of the proceeds from these transactions to cover Abakan's expenses and to pay his own salary. From June 1, 2013 to February 16, 2015, Abakan made net payments to Miller of $308,975.92 and net payments to Miller's corporate entity, Prosper Financial, of $208,761.56, for a total of $517,737. *See* ECF 174, at 18:6–22:17. Miller used Prosper Financial to pay his personal expenses.[2] ECF 175, at 23:3–5, 24:8–12; *see also* Pl.'s Ex. 233, at 33, 35:3–7.

Abakan ultimately failed, and in May 2018, the SEC revoked the registration of its stock.

Miller's conduct impacted Abakan investors. Steven Zielske relied on Abakan's SEC disclosures when he invested in Abakan from 2013 to 2016. *See* ECF 173, at 97:7–101:20, 103:2–108:22. Ultimately, Zielske lost approximately $72,000 that he invested in Abakan. *Id.* at 112:25–114:24. Bruce Weinstein, another investor, lost the $20,000 that he invested in Abakan. *Id.* at 146:24–147:1. As of May 2013, Abakan had $9.6 million in stockholder equity. Pl.'s Ex. 13, at 43. Much of that equity was wiped out when Abakan failed.

Miller kept records that showed that he controlled the Abakan shares held by the Uruguayan entities and that he did not disclose the transactions to Abakan's shareholders. *See* Pl.'s

---

[2] The Court treats Prosper Financial as Miller's alter-ego. ECF 186, at 16 n.4.

Ex. 214. At trial, Miller insisted he did not control the Uruguayan entities' Abakan shares and that he had done nothing wrong. He testified, "I consider this case ridiculous, obscene." ECF 178, at 32:7. He also rejected out-of-hand the SEC's allegations, asserting: "I'm not accepting what [the SEC is] saying." *Id.* at 28:23. He called himself "vindictive," which he defined to mean he will "fight" "any charge whatsoever against" him and to mean that he "consider[s] [any charge] an offense, and next time [he]'ll be better prepared." *Id.* at 32:13–16.

The SEC presented evidence that Miller believes he is judgment proof. At his deposition, Miller was asked if he considers himself judgment proof. He responded: "It depends on the judgment. In this case, yes." Jt. Ex. 5, at 319:13–15. Miller acknowledged he has not paid any of a $3.8 million judgment against him in a private lawsuit filed against him in Florida, stating "nothing ever will be paid." *Id.* at 306:11–18; Pl.'s Ex. 219. Miller testified that he maintains his assets outside the United States and will continue to do so. ECF 178, at 31:12–17 ("And my assets are held by these offshore companies until I get out of this mess.").

At the conclusion of the eight-day trial, the jury returned a verdict for the SEC on all counts. ECF 161. The jury found Miller violated Securities Act §§ 5(a) and (c) and 17(a) (15 U.S.C. §§ 77e(a), 77e(c), 77q(a)), Exchange Act § 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), Exchange Act Rule 13a-14 (17 C.F.R. § 240.13a-14), Exchange Act § 13(d) (15 U.S.C. § 78m(d)) and Rules 13d-1 and 13d-2 thereunder (17 C.F.R. §§ 240.13d-1, 240.13d-2), and Exchange Act § 16(a) (15 U.S.C. § 78p(a)) and Rules 16a-2 and 16a-3 thereunder (17 C.F.R. §§ 240.16a-2, 240.16a-3). *Id.* And the jury found that Miller "knowingly or with severe recklessness" did not disclose his beneficial ownership of the Abakan shares held by Stratton, Green Chip, and River Fish. *Id.* at 3.

After trial, the SEC moved for the entry of final judgment and remedies for the securities law violations. ECF 172. On September 30, 2024, the Court granted the SEC's motion in substantial part. *SEC v. Miller*, No. DLB-19-2810, 2024 WL 4534512 (D. Md. Oct. 21, 2024). Specifically, the Court permanently enjoined Miller from further securities violations and enjoined him from serving as an officer or director of a public company and from participating in penny-stock offerings for ten years. *Id.* at *13. The Court also imposed a civil penalty of $160,000 and ordered Miller to repatriate his assets to satisfy the judgment. *Id.* The Court denied without prejudice the SEC's request for disgorgement and prejudgment interest and allowed the SEC to renew its request. *Id.* The SEC then renewed its request for disgorgement and prejudgment interest. ECF 192.[3] The matter is fully briefed. ECF 192, 200, 200-1; *see also* ECF 192-1 – 192-13, 195-1, 199, 199-1 (exs.). A hearing is not necessary. *See* Loc. R. 105.6 (D. Md. 2025).

## II.    Standard of Review

Under 15 U.S.C. § 78u(d)(5), a court may order a defendant to disgorge funds he obtained through violations of securities laws. *See Liu v. SEC*, 591 U.S. 71, 74–75 (2020); *see also SEC v. Resnick*, 604 F. Supp. 2d 773, 782 (D. Md. 2009); *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 425 (D. Md. 2005). "Disgorgement is an equitable remedy designed to prevent the unjust enrichment of the wrongdoer and to deter others from violating the federal securities laws." *SEC v. Marker*, 427 F. Supp. 2d 583, 591 (M.D.N.C. 2006). Disgorgement is limited "to that which 'may be appropriate or necessary for the benefit of investors.'" *Liu*, 591 U.S. at 87 (quoting 15 U.S.C.

---

[3] Miller asked for an extension of time to respond to the SEC's renewed request for disgorgement, and the Court granted his request. ECF 197, 198. Miller then gave the SEC an unsworn, unsigned opposition, but he did not file the opposition with the Court. *See* ECF 200-1 (exhibit to SEC reply). Instead, Miller filed only the exhibits to his opposition. ECF 199. The SEC attached Miller's opposition to its reply, ECF 200-1, and even though Miller did not sign or properly file the opposition with the Court, the Court will consider it.

§ 78u(d)(5)). Before "ordering disgorgement under § 78u(d)(5)," the court "must deduct legitimate expenses." *See id.* at 91–92.

Courts possess "broad discretion not only to order the disgorgement of any ill-gotten gains, but also to determine the amount to be disgorged." *SEC v. Laura*, No. 18-CV-5075, 2024 WL 3360380, at *2 (E.D.N.Y. July 9, 2024) (quoting *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 562–63 (S.D.N.Y. 2009)); *see also Resnick*, 604 F. Supp. 2d at 782 (noting that courts have "broad discretion in determining whether to award disgorgement and in what amount").

The Fourth Circuit has not yet adopted a framework for determining how to calculate disgorgement. Other circuits use a two-step process. *See SEC v. GenAudio Inc.*, 32 F.4th 902, 945 n.22 (10th Cir. 2022); *SEC v. Hallam*, 42 F.4th 316, 341 (5th Cir. 2022); *SEC v. Zada*, 787 F.3d 375, 382 (6th Cir. 2015); *SEC v. Teo*, 746 F.3d 90, 105 (3d Cir. 2014); *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010); *SEC v. Happ*, 392 F.3d 12, 31 (1st Cir. 2004); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989); *see also SEC v. Perkins*, No. 5:19-CV-243, 2023 WL 5418712, at *4 (E.D.N.C. Aug. 22, 2023) (applying two-step process).

First, the SEC bears the burden of establishing a "reasonable approximation of the profits." *Razmilovic*, 738 F.3d at 31. The SEC must show that the profits are "causally linked" to the securities violations. *See Resnick*, 604 F. Supp. 2d at 783 (denying disgorgement of defendant's salary when SEC did not show that salary "was causally linked to his unlawful conduct"). Profits refers to "net profits." *See Hallam*, 42 F.4th at 341. Thus, the SEC must deduct legitimate business expenses because a disgorgement amount cannot "exceed the gains 'made upon any business or investment, when both the receipts and payments are taken into the account.'" *Liu*, 591 U.S. at 91 (quoting *Providence Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788, 804 (1869)).

Next, the burden shifts to the defendant to "prove that the requested amount is 'unreasonable.'" *Hallam*, 42 F.4th at 341 (quoting *SEC v. Halek*, 537 F. App'x 576, 581 (5th Cir. 2013)). To do so, the defendant must "show his gains 'were unaffected by his offenses.'" *Razmilovic*, 738 F.3d at 31 (quoting *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)). The defendant may identify additional business expenses that they believe the SEC should have deducted. *See SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (recognizing that the defendant bears the burden "to identify any additional 'legitimate' business expenses that, consistent with *Liu*, should have been deducted from an otherwise reasonable disgorgement amount"). To establish that they "made additional legitimate business expenses beyond those the SEC has accounted for in its approximation," a defendant "must 'provide concrete and credible evidence to demonstrate the amount of money spent on any of the alleged business expenses or whether any of the business expenses were legitimate.'" *SEC v. Kon*, No. 1:21-CV-24320-RKA, 2023 WL 195203, at *2 (S.D. Fla. Jan. 17, 2023) (quoting *CFTC v. Tayeh*, 848 F. App'x 827, 830 (11th Cir. 2021)), *aff'd*, No. 23-10738, 2024 WL 2271183 (11th Cir. May 20, 2024).

At the end of the day, "[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation." *Razmilovic*, 738 F.3d at 31 (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)). Ultimately, the Court does its best to approximate the gains from the fraud, keeping mind that "because of the difficulty of determining with certainty the extent to which a defendant's gains resulted from his frauds . . . the court need not determine the amount of such gains with exactitude." *Id.*

### III.    Discussion

Miller's fraudulent scheme generated over a million dollars in proceeds for Abakan. *See* ECF 189, at 4–5. From the River Fish transactions alone, Abakan and other Miller-related entities

received approximately $1 million. *See* ECF 174, at 40:21–41:17. The SEC does not seek to disgorge all proceeds derived from the illicit transactions. Instead, the SEC seeks to disgorge $517,737, which it claims is a reasonable approximation of Miller's profits from the fraud.

The SEC divides the requested disgorgement amount into three types of payments to Miller: (1) his salary ($244,248), (2) other payments to Miller or "associated with Mr. Miller" for which Miller and Abakan "have provided virtually no information" ($136,762), and (3) "[p]ayments with some indication that they are business expenses" ($45,253). ECF 192, at 5, 11–13. The SEC has shown how it arrived at these amounts. At trial and in an affidavit, SEC accountant Andrea Fox explained how she traced and calculated the money that Abakan paid to Miller and Prosper Financial. *See* ECF 174, at 19:3–22:17; ECF 192-13. Fox reviewed transactions in Abakan's ledger for the period of June 1, 2013 until February 16, 2015. ECF 192-13, ¶ 3. She identified cash payments associated with Miller or Prosper Financial by running key word searches of terms including "Miller, Robert, RHM, Prosper, and PF." *Id.* Fox determined that Abakan's cash withdrawals, cash deposits, and payments made directly to Miller, Prosper Financial, and Miller's second ex-wife, Maria Maz, totaled $335,722. *Id.* ¶ 6; *id.* at 12.[4] Fox also compared the cash withdrawn by or paid to Miller, Maz, or Prosper Financial in 2014 ($244,248) to Miller's reported salary on his 2014 Form 1099 ($244,388) and determined that they were nearly identical. *Id.* ¶ 11; *id.* at 12. She concluded that "the net cash received by Robert Hillis Miller and Prosper Financial" over the fraudulent period was $517,737. ECF 174, at 22:12–14.

Miller does not seem to dispute that $517,737 is an accurate approximation of funds Abakan paid to him (or for his benefit) and Prosper Financial between 2013 and 2015. *See* ECF

---

[4] The SEC offered evidence at trial that Miller had some of his payments from Abakan funneled through Maz and Prosper Financial. ECF 173, at 191:7 – 192:21.

200-1, at 10. Instead, Miller claims that those payments were "legitimate" and not causally connected to the fraud. *Id.* He states that much of the $517,737 "was for entirely legitimate company expenses that [he] paid for directly on his own or Abakan's credit cards, and then was reimbursed." *Id.* at 6. As for the rest of it, his salary and payments for other expenses, Miller argues that that money came from other sources, not from the illicit transactions. *Id.*

## A. Miller's Salary

The SEC seeks disgorgement of Miller's salary between June 2013 and February 16, 2015. The SEC provides evidence that Miller received a salary of $47,361 in June through December of 2013, $242,533 in 2014, and $45,828 from January 1 to February 16, 2015, for a total of $335,722. ECF 192-13, at 12, 14.[5]

Courts may order disgorgement of salaries paid to defendants during the period of the fraud. *See SEC v. Johnston*, 368 F. Supp. 3d 247, 254 (D. Mass. 2019) ("[C]ourts commonly order defendants to disgorge not only the proceeds of a fraud but also salary and bonuses earned during the period of a fraud and amounts equivalent to losses avoided as a result of the securities violation."); *SEC v. Conaway*, No. 2:05-CV-40263, 2009 WL 902063, at *20 (E.D. Mich. Mar. 31, 2009) ("Maintaining a fraudulent scheme so that one may continue to reap the benefit of a salary or other employment related benefits is enough to support a disgorgement order."). For example, in *SEC v. First Pacific Bancorp.*, the Ninth Circuit affirmed the district court's order for the individual defendant, the chief executive officer of the defendant bank, to disgorge "hundreds of thousands of dollars" he received from the bank as "salaries, commissions, and consulting, management and legal fees" because the money represented a "personal financial benefit [he

---

[5] Miller's salary is calculated by subtracting cash that Miller provided to Abakan from the salary Abakan paid him. ECF 192-13, ¶¶ 9–10.

received] as a result of the bank's fraud," which "put off a bank failure and enabled the Bank to remain in operation for two and a half more years." 142 F.3d 1186, 1192 (9th Cir. 1998). And, in *SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005), the district court ordered disgorgement of one-half of the defendants' base salaries because, "[b]ut for the securities violation, [the company] would have collapsed earlier, so the violations enabled the defendants to continue their employment." In its discretion, the court reduced disgorgement to one half because of the "the fact that both defendants also provided real and valuable services" to their employer for many years. *Id.*

If the SEC does not prove a causal connection between the salary and the fraud, courts should deny a request to disgorge a defendant's salary. *See SEC v. Chapman*, 826 F. Supp. 2d 847, 859 (D. Md. 2011) (denying disgorgement of salary when SEC "d[id] not contend that Chapman would not have received his salary or bonuses for those months" if he did not engage in the fraud); *Resnick*, 604 F. Supp. 2d at 783 (granting disgorgement of bonuses but denying disgorgement of salary when SEC did not show that defendant's "entire income—not simply his bonuses—was tied to his meeting earnings targets" and when the defendant would have otherwise been paid an annual salary without the fraud); *Razmilovic*, 738 F.3d at 32–33 (affirming district court's conclusion that "only so much of [Razmilovic's salary and bonuses] as resulted from the fraud should be disgorged").

Miller's salary during the period of fraud should be disgorged. The SEC has shown that Miller's salary is causally connected to the illicit transactions. The evidence at trial showed that Abakan depended on the illegitimate funds from Green Chip, River Fish, and Stratton to sustain its business and remain operational. Cox's review of Abakan's ledger showed that low or negative bank balances immediately preceded deposits of proceeds from the fraudulent transactions. *See*

ECF 174, 22:20–25:19. For instance, before proceeds from the Yorkville loan were deposited into Abakan's account, Abakan owed more than a million dollars in bills, including at least $748,458.26 in bills that were more than 91 days past due. *Id.* at 41:3–7. After these proceeds were deposited into Abakan's bank account, Abakan would then pay Miller and Prosper Financial— often within a few days of the deposit. *See* Pl.'s Ex. 10. At trial, Miller agreed that in "the second half of 2013, Abakan was running out of money" and "struggling to pay its bills." ECF 176, at 37:3–7. He testified that Abakan owed him money. *Id.* at 38:5–6. When asked if Abakan owed him "nearly $120,000," Miller testified that Abakan owed him "much more than that." *Id.* at 41:12–16. "At some times," Miller continued, Abakan owed him "hundreds of thousands of dollars in expenses." *Id.* at 41:22–23. While it is true, as Miller argues, that Abakan received money from other apparently legitimate sources, including share subscriptions and other cash flows, *see* Pl.'s Ex. 2, the SEC has established that Abakan would not have survived—and thus Miller would not have gotten paid a salary—without the fraudulent proceeds.[6] That is enough to show a causal link between the fraud and Miller's salary. *See First Pac. Bancorp*, 142 F.3d at 1192; *Church Extension*, 429 F. Supp. 2d at 1050.

Given the precariousness of Abakan's solvency throughout the fraudulent period and the payments to Miller and Prosper Financial made shortly after the cash infusions from the fraudulent transactions, the SEC has shown that Miller's salary was causally connected to the fraud. Miller would not have received a salary without the fraudulently obtained payments because the company would have been insolvent. The SEC has met its burden of showing that $335,722 in salary payments to Miller in 2013, 2014, and 2015 should be disgorged.

---

[6] The SEC explains that Miller's salary, as the SEC calculates it and as Miller calculated it on his Form 1099 for 2014, includes payments that appear to be reimbursement for expenses that Miller paid. ECF 192, at 4–5.

The burden now shifts to Miller to show that his salary should not be included in the approximation of his profits or that less than the amount sought by the SEC should be disgorged. In his opposition, Miller argues that, even if the transactions at issue were fraudulent (which he still disputes), Abakan had sufficient funding to pay his salary. ECF 200-1, at 6. He contends that his salary should not be disgorged because it was "paid from a large amount of investment from a variety of sources, all of which were fungible and which amounted to many orders of magnitude beyond the amount contributed to the Company by the disputed trades, including $3,000,000 from sources such as UP Scientech, a major industry partner." *Id.* Miller has not submitted any evidence to support his contention that he was "paid from a large amount of investment from a variety of sources" or that Abakan received "$3,000,000 from sources such as UP Scientech." *See id.* At trial, Miller and a Mesocoat employee testified about a payment from UP Scientech. *See* ECF 176, at 37:10–11, 225:2–5. And Miller testified that he received much of his 2014 salary about the same time that Abakan received $3,000,000 from UP Scientech. ECF 177, at 159:9–21. But this trial testimony was not corroborated by, for example, testimony from an agent of UP Scientech or wire transfer records. What's more, Miller's other trial testimony indicates that Abakan did not have sufficient funds from non-fraudulent transactions to pay Miller's salary. *See* ECF 176, at 41:3 – 43:25 (Miller's testimony that Abakan owed significant amounts, including more than $120,000 in salary to him, and that he would not have been paid if Abakan went under); *id.* at 166:11–24 (Miller's testimony that Abakan had no money at the time it received the loan from Green Chip); ECF 177, at 161:1–21 (Miller's testimony that Abakan was "short of cash" in 2014). Miller's protestation that he would have received a salary during the relevant period even if the fraudulent transactions had not occurred is not supported by sufficient evidence. Miller has not met his burden of showing that the disgorgement of his salary is unreasonable.

The Court finds that $335,722 in salary paid to Miller during the period he committed securities fraud should be disgorged.

### B. Other Payments

The SEC seeks disgorgement of $136,762 that Abakan paid—for no discernable reasons—to Miller or entities that were not identified as vendors or other business contacts during the fraudulent period. Nothing in Abakan or Miller's records indicates what these payments were for. For instance, Abakan's general ledger includes several payments for credit cards in Miller's name, *see* ECF 192-13, at 6–10, but the ledger does not state what the charges were for. So the SEC cannot determine whether the payments towards Miller's credit cards were for legitimate business expenses. Another example of the problem: Abakan's ledger includes payments to entities such as "Hybar Naturally," "Grand Bay Cove," "White Spot Vancouver, B.C.," Virginia Polytechnic Institute, and Walgreens, but the ledger does indicate what these payments are for. *Id.* The SEC, understandably, cannot discern any legitimate business purpose for these charges either. When, as here, a defendant's financial records "or lack thereof has so obscured matters that calculating the exact amount of illicit gains cannot be accomplished without incurring inordinate expense, it is well within the district court's discretion to rule that the amount of disgorgement will be the more readily measurable proceeds received from the unlawful transactions." *S.E.C. v. Calvo*, 378 F.3d 1211, 1217–18 (11th Cir. 2004) (citing *CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242, 1252 (2d Cir. 1986)). Miller and Abakan's business records have obscured the reasons that Abakan sent $136,762 to Miller and entities that were not identified as vendors or business contacts. The adverse consequences of maintaining indecipherable financial records fall on Miller, not the SEC. *See id.* at 1217 ("any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty"). Because Miller's records are so deficient that the SEC (and the Court) cannot

discern the purposes of these payments, the Court finds that the SEC has met its burden of showing that $136,762 in payments to Miller and entities unrelated to Abakan's business operations should be included in the reasonable approximation of profits. These payments, like Miller's salary, were causally connected to the securities violations because they could not have happened without the fraudulent transactions that kept Abakan afloat.

To establish that these payments were legitimate business expenses and should not be disgorged, Miller must provide "concrete and credible evidence" that demonstrates the value of the expenses and proves that the expenses furthered a legitimate business purpose. *Tayeh*, 848 F. App'x at 830; *see SEC v. Cell>Point, LLC*, No. 21-cv-01574, 2025 WL 726523, at *7 (D. Colo. Mar. 4, 2025) (same). *SEC v. Owings Group, LLC*, provides guidance on what is required to prove payments were for legitimate business expenses. No. RDB-18-2046, 2021 WL 1909606, at *5 (D. Md. May 12, 2021), *aff'd on other grounds sub nom. SEC v. Johnson*, 43 F.4th 382 (4th Cir. 2022). There, the SEC sought disgorgement of amounts that the individual defendants (the corporate defendants' salesmen Brian Koslow and David Waltzer) had received as compensation. *Id.* The individual defendants insisted these amounts included "legitimate business expenses that should [have been] deducted." *Id.* The defendants "provide[d] an exhibit with spreadsheets entitled 'Breakdown of Commissions Paid Out,' and list[ed] check amounts for various 'expense reimbursement[s].'" *Id.* The court concluded that exhibit, which was "unsworn and d[id] not provide any detail as to what the expenses were," did "not overcome the SEC's showing of a 'reasonable approximation' of the respective ill-gotten gains, which reflect[ed] compensation payments of $142,050 to Koslow and $149,240 to Waltzer." *Id.* The court noted that "any 'doubts are to be resolved against the defrauding party.'" *Id.* (quoting *Resnick*, 604 F. Supp. 2d at 782).

Here, Miller has not satisfied his burden of showing that $136,762 in payments made to him or Prosper Financial (or any part of that amount) represents legitimate business expenses. Miller submitted an opposition, but he did not file it with the Court properly, did not sign it, and did not swear to its contents. The opposition is not evidence. The meager evidence that Miller did submit to the Court is a morass of receipts and a single, four-page credit card statement from a two-month period, November and December 2014. *See* ECF 199. Miller explains that he often put Abakan expenses on his personal credit card, and to distinguish between personal expenses and business expenses, Miller drew a small circle next to each line item on the credit card statement that he claims is a legitimate business expense. *See* ECF 200-1, at 4. The following excerpt from Miller's unsworn, unsigned opposition is his attempt to justify some of the circled expenses:

> The attached November December monthly statement from Proposed Defense Exhibit 7 consisting of Robert Miller's Chase card is attached as an example with four pages of charges and another eleven pages of supporting receipts, for portions of the three international trips. Mr. Miller was in Dubai for a third visit at the invitation of Dr. Harry Moraes, the founder and Chairman of Fabtech International part of the Fabtech Group, based in Dubai but with operations in, or nearby, the international oil industry hubs of Houston, Edmonton, Aberdeen, Djibouti and which has 17,000 employees. While Mr. Miller was in Dubai several payments were made; including one to Davidson & Company for Company accounting work, a second charge to Island Stock Transfer, Abakan's Transfer Agent and other trip expenses including the return flight.

ECF 200-1, at 3. Far from a model of clarity, this hodgepodge of an explanation falls woefully short of justifying exclusion of the amounts associated with the circled charges on Miller's credit card statement.

Despite the myriad flaws in Miller's filings, the Court attempted to cross-check the circled expenses on the credit card statement with the explanation Miller provided in his opposition. It was impossible. For example, there is a $482.23 charge on November 17, 2014, which Miller circled. *See* ECF 199, at 1. That charge is for "Hotels.com." *Id.* Was that charge for a legitimate

business purpose? Was it for his Dubai hotel or for something else? What about the $10.89 charge to Moevenpick Hotel Dubai? *Id.* at 2. Miller also circled a $2,600 charge to Wolf Rifkin Shapiro and an $839.80 charge to "Lenovo Group," but he does not address either expense in his opposition. *Id.* at 3, 4. The Court will not do Miller's work for him. Without any evidence that the circled transactions were for legitimate business expenses, the Court will not exclude them from the disgorgement amount. *See SEC v. Griffithe*, No. 20-124, 2024 WL 6551385, *2 (C.D. Cal. Nov. 18, 2021) (declining to deduct payment where defendant "ha[d] no records demonstrating its purpose").

Miller also submitted ten pages of receipts for transactions that occurred in late 2014. ECF 199, at 5–14. Many of the receipts are in non-U.S. currency. *See* ECF 199, at 5 (receipt for Maritim Hotel Dusseldorf in euros), 6 (receipt in euros), 13 (same), 14 (same). Several of the receipts are not in English. *See id.* at 6, 7, 8, 13, 14. Some are practically illegible. *See id.* at 10, 11, 12, 15. Having reviewed the receipts, the Court is unable to discern whether the charges were for legitimate business expenses. The paltry evidence that Miller has submitted does not satisfy his burden of establishing that the $136,762 that Abakan paid to him and Prosper Financial (or any part of that amount) during the fraudulent period was for legitimate business expenses.

Separately, Miller seeks to deduct two payments to Grand Bay Cove that the SEC identified in Abakan's ledger. Miller claims that Grand Bay Cove is Abakan's landlord and that the two payments in the Abakan general ledger were for Abakan's "normal monthly office rent." ECF 200-1, at 11. Miller submitted no receipt or other evidentiary proof that those two payments were for Abakan's rent. Without a declaration or any other evidence that the payments to Grand Bay Cove were for Abakan's rent, the Court declines to deduct them. *See Laura*, 739 F. Supp. 3d at 15 (declining to deduct "certain monetary transfers and expenses for travel, housing, furniture,

transportation, insurance, and certain cash withdrawals and transfers" when the defendant did not "point[] to any specific proof of validity for each expense identified by the SEC such as contracts or consulting agreements, reimbursement reports, emails, or contemporaneous documentation reflecting a business purpose").

In sum, Miller's unsigned, unsworn, unfiled opposition, a four-page credit card statement, and ten pages of partially illegible and unexplained receipts are not "concrete and credible evidence" of Abakan's legitimate business expenses. *See Cell>Point*, 2025 WL 726523, at *9 (finding that defendant's declaration, without documentary support, was not concrete and credible evidence of the value of the defendants' business expenses); *SEC v. Complete Bus. Sols. Grp., Inc.*, No. 20-CV-81205, 2024 WL 4826059, at *16 (S.D. Fla. Nov. 18, 2024) (finding it "impossible" to determine legitimate business expenses from bank statements alongside defendant's declaration, when descriptions of line items in bank statements were things like "Direct Pay" or "Bills.com Payables" and did not "indicate what bills were being paid"); *Kon*, 2023 WL 195203, at *3 (finding unsworn, undetailed spreadsheet of purported business expenses with affidavit from business associate was not concrete and credible evidence). Miller has had two opportunities—first in response to the SEC's initial request for disgorgement and again in response to its renewed request—to provide concrete and credible evidence of Abakan's business expenses; he failed both times. Miller has not met his burden of showing that the $136,762 that Abakan sent him and certain entities, for indiscernible reasons, during the fraudulent period should not be disgorged. Under these circumstances, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *First City*, 890 F.2d at 1232.

### C. Possible Business Expenses

The SEC seeks disgorgement of $45,253 for "payments in Abakan's general ledger during the relevant time period [that] have a notation or other indication in the general ledger that they are potential business expenses." ECF 192, at 13. The ledger entries "include payments to airlines with the notation '578500 General and Administrative Travel' a $45 'office lunch,' and two credit card payments with the notation "Abakan Inc. expenses pd)." *Id.* The SEC argues that "on the unique facts of this case, the Court should order Mr. Miller to disgorge the payments that appear to be reimbursements for expenses" because, "but for the fraud[,] Mr. Miller would not have received these payments." ECF 192, at 19, 20 (capitalization omitted).[7]

As the SEC acknowledges, the Court already rejected this argument. *Id.*; *see SEC v. Miller*, No. DLB-19-2810, 2024 WL 4534512, at *10 (D. Md. Oct. 21, 2024). The SEC rehashes its argument without any supporting caselaw. The SEC has conceded that the $45,253 it seeks to disgorge includes business expenses. *See* ECF 124, at 85:1–2 (SEC statement that it "[did not] dispute that some of the money that went to Mr. Miller was reimbursement for business expenses"); *see also* ECF 174, at 20:8–11 (SEC accountant Andrea Fox's testimony that some of the payments in the $517,737 calculation "could have been reimbursement for business

---

[7] In support of its request for disgorgement of possible business expenses, SEC refers to Miller's proposed trial Exhibit 7, a compilation of credit card statements and receipts. ECF 195, ¶ 2 (Bruckmann Decl. explaining that the SEC submitted, at ECF 195-1, a seven-page excerpt of Exhibit 7 in support of its renewed motion). Miller, in his request for an extension of time, argues that the SEC should not be allowed to rely on his proposed trial Exhibit 7 because the Court excluded it from evidence. ECF 197, at 1. (The Court excluded it because it was produced just weeks before trial, was harmful to the SEC, and the delay was not substantially justified. ECF 124, at 87–91.) The Court need not, and has not, considered the excluded trial exhibit or the seven-page excerpt of the exhibit (ECF 195-1). The SEC's motion to seal ECF 195 and 195-1, ECF 196, is denied because the SEC redacted Miller's account number and home address from the credit card statements and there is no justification for sealing the redacted exhibits or the declaration explaining them.

expenses"). As the Court said before: "Given that the SEC concedes that its proposed disgorgement amount includes both profits and business expenses, a disgorgement order for the entire amount the SEC seeks would run afoul of *Liu* and 'test the bounds of equity practice.'" *Miller*, 2024 WL 4534512, at *10 (quoting *Johnson*, 43 F.4th at 393 (quoting *Liu*, 591 U.S. at 85))). The SEC has not submitted any evidence or authority to support its claim that the "unique facts of this case" allow the Court to order the disgorgement of what the SEC concedes includes payments for legitimate business expenses. The SEC has not met its burden of showing that $45,253 in likely business expenses is a reasonable approximation of profits.

The Court finds that $472,484 is a reasonable approximation of Miller's profits from the fraud. The Court also finds that prejudgment interest on the disgorgement amount based on the tax underpayment rate in 26 U.S.C. § 6621(a)(2) is appropriate. *See Resnick*, 604 F. Supp. 2d at 782 (noting a court may include prejudgment interest in the disgorgement amount). The SEC shall provide an affidavit in support of its prejudgment interest calculation by October 14, 2025. For the reasons stated previously, the Court orders Miller to repatriate assets sufficient to satisfy the final judgment, including the disgorgement amount. ECF 189, at 25.

## IV.    Conclusion

For the foregoing reasons, the Court grants the SEC's renewed request for disgorgement in part and orders Miller to pay $472,484 in disgorgement and prejudgment interest in an amount to be determined. Miller must repatriate his assets to satisfy the final judgment. The Court's final judgment will be entered after the SEC submits the prejudgment interest amount.

Date: September 30, 2025

Deborah L. Boardman
United States District Judge